Argued and submitted May 13, accused suspended six months August 4,
reconsideration denied September 15 and October 6, 1987

In re Complaint as to the Conduct of

# FERRIS F. BOOTHE,
*Accused.*

## (OSB 85-34 and 85-93; SC S33511)

740 P2d 785

Mark M. Williams, Lake Oswego, argued the cause and filed the brief on behalf of the Oregon State Bar.

Thomas S. Boothe, Portland, argued the cause and filed the briefs on behalf of the accused.

Before Peterson, Chief Justice, and Lent, Linde, Campbell, Carson and Gillette, Justices.

PER CURIAM

## PER CURIAM

The accused is charged with six instances of professional misconduct arising out of his representation of two clients, Mary Damskov and Mark Hemstreet. He seeks review of the trial panel's findings that he was guilty of five of those charges and its recommendation that he be suspended from the practice of law for six months. We find the accused guilty of violating *former* Disciplinary Rules 9-102(B)(3) and (4) (failing to account for property of a client; failure promptly to pay over to the client funds to which the client was entitled), 1-102(A)(4) (conduct involving dishonesty, fraud, deceit or misrepresentation), 1-102(A)(5) (conduct prejudicial to the administration of justice), and 9-102(A) (treatment of funds belonging in part to the lawyer and in part to the client), and not guilty of violating DR 7-104(A)(1) (communication with one known to be represented by counsel). The accused is suspended from the practice of law for a period of six months.

## THE DAMSKOV MATTER

### 1. THE FACTS

Mary Damskov executed a power of attorney in favor of the accused in 1973. Pursuant to the exercise of that power, the accused held various papers and property belonging to Damskov. On January 19, 1984, Damskov revoked the accused's power of attorney and executed a new power of attorney in favor of Helen L. Casterline. In the instrument revoking the accused's power of attorney and in an accompanying certified letter, Damskov demanded an accounting and requested that the accused deliver her papers and property to Casterline. In a letter dated February 1, 1984, Damskov specifically requested that the accused deliver to Casterline the original of Damskov's will. Damskov's lawyer, Paul Meyer, also wrote to the accused demanding the return of Damskov's property on February 15 and 27, 1984.

On March 1, 1984, the accused delivered to Casterline stocks, bonds, and jewelry belonging to Damskov. On March 2, 1984, a court order appointed Casterline as Damskov's guardian and conservator.

Casterline wrote to the accused on March 5, 1984, again requesting Damskov's will. On March 12, 1984, the accused responded:

"I respectfully decline to turn over to you the original of the Will of Mary Damskov which she executed on September 14, 1983. I am named as Personal Representative of that Will. I believe that I am entitled to retain it."

On March 30, 1984, the accused delivered an accounting of Damskov's affairs to Casterline. The accounting listed the following as a deposit on January 5, 1984:

"From proceeds of U.S. Bonds received from Jenny Clay Estate: purchased $20,000 TCD 0030021481 and deposited the remainder of [$]7,375.20."

A lawyer from Meyer's law firm wrote to the accused on May 4, 1984, again demanding Damskov's will. On July 11, 1984, another lawyer, Robert Dressler, wrote to the accused, informing him that he represented Casterline in connection with her power of attorney over Damskov's affairs and demanding that the accused deliver the will to Casterline. The accused responded that he intended to retain the will until Damskov's death in case there was a will contest.

On March 25, 1985, the accused wrote directly to Casterline. The letter, which proposed a "final settlement of all matters between you and me," stated, in part:

"* * * I think that Mr. Meyer's demand that I turn over the original of the Will which I prepared for Mary Damskov was out of line and I intended to resist it. To that end, I withheld the sum of $9,000 from sums which I would otherwise have distributed to you to make sure that our attorneys' fees were paid for the work we had done and to finance any further litigation which might have resulted had any legal action been filed against me in connection with my handling of the will or the affairs of Mary Damskov. * * * My final billing is $8,700, of which $4,000 has been paid and $4,700 is still owing. If I can have your assurance that no litigation will be filed against me for the lack of delivery of the original Will and we may agree that neither has any claims against the other, I will be pleased to pay you the difference between the $9,000 withheld and the additional $4,700 of fees by a check payable to your order in the sum of $4,300."

Casterline did not respond to the accused's proposal. Instead, on March 30, 1985, she filed a letter of complaint with the Oregon State Bar (the Bar). Subsequently, the accused and Casterline reached a settlement agreement under which the accused would retain $5,000 in attorney fees and would

deliver the remaining funds and Damskov's will to Casterline. Casterline, in return, agreed to release the accused from all claims arising out of his power of attorney over Damskov's affairs.

## 2. THE CHARGES

### a. Communication with represented person

The Bar alleged that, in writing to Casterline on March 25, 1985, the accused violated DR 7-104(A)(1), which, at that time, provided:

"During the course of his representation of a client a lawyer shall not:

"(1) Communicate or cause another to communicate on the subject of the representation, or on directly related subjects, *with a person he knows to be represented by a lawyer* on that subject, or directly related subjects, unless he has the prior consent of the lawyer representing such other person or is authorized by law to do so."[1] (Emphasis supplied.)

In a letter dated January 25, 1984, Paul Meyer requested that the accused "have no further direct contact with Mrs. Damskov but that you deal with Mrs. Damskov *either through Mrs. Casterline,* to whom Mary Damskov has given a power of attorney, or with me * * *." (Emphasis added). Meyer never revoked this authorization to contact Casterline directly regarding Damskov's affairs. Thus, if Meyer represented Casterline at the pertinent time, the accused's actions did not violate the rule.

The Bar nonetheless argued, and the trial panel agreed, that the accused had a duty to communicate with Casterline only through Robert Dressler, who had represented Casterline in July, 1984. The evidence, however, showed that Dressler no longer represented Casterline in March, 1985,

---

[1] DR 7-104(A)(1) was amended in 1985. It now provides:

"During the course of the lawyer's representation of a client, a lawyer shall not:

"(1) Communicate or cause another to communicate on the subject of the representation, or on directly related subjects, with a person the lawyer knows to be represented by a lawyer on that subject, or on directly related subjects, unless the lawyer has the prior consent of the lawyer representing such other person or is authorized by law to do so. This prohibition includes a lawyer representing the lawyer's own interests."

when the accused wrote to her. The Bar argues, nevertheless, that:

> "[T]hat information [that Dressler no longer represented Mrs. Casterline] was not known by the Accused at the time he communicated with Mrs. Casterline and is therefore irrelevant to the consideration of this matter. The Accused had a continuing obligation to seek the permission of Mrs. Casterline's attorney prior to communicating with her on the subject of his representation."

We disagree. As the emphasized language of the Rule demonstrates, DR 7-104(A)(1) prohibits communication with *represented* persons. Because Dressler did not represent Casterline, the accused had no duty to request Dressler's permission before communicating with her. It is a fortuity, but the accused is not guilty of violating DR 7-104(A)(1).

### b. Retention of the will and $9,000

■■ The Bar alleged that, in failing to deliver to Casterline the original of Damskov's will and $9,000 of her money, the accused violated *former* Disciplinary Rules 9-102(B)(3) and (4).[2] Those rules provided:

> "A lawyer shall:
>
> "* * * * *
>
> "(3)   Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them.
>
> "(4)   Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive."

There is no question that the accused refused to relinquish Damskov's will, despite repeated demands for its return. The accused, however, contends that, as the personal representative under the will, he had the right to retain the original. He cites no persuasive legal authority for that proposition,

---

[2] In 1985, those disciplinary rules were amended in immaterial particulars and renumbered as DR 9-101(B)(3) and (4).

and we are aware of none.[3] In refusing to deliver the will, the accused violated *former* DR 9-102(B)(4).

The accused admits that he retained $9,000 of Damskov's money in his client trust account after she had requested that he deliver all of her property to Casterline. Moreover, the accounting of March 30, 1984, did not disclose that amount; it listed only $27,375.20 of the $36,375.20 actually received from the Jenny Clay estate. The accused violated *former* DR 9-102(B)(3) when he failed to account for the $9,000.

The accused also violated *former* DR 9-102(B)(4) by refusing to "[p]romptly pay or deliver to the client as requested * * * funds * * * which the client is entitled to receive." The accused argued that he was entitled to retain part of the money as attorney fees. He attempted to justify his retention of the remaining sum as a "war chest" — his term — to compensate him in the event of future litigation arising out of his representation of Damskov or in the event of a will contest. The accused, however, no longer represented Damskov. We agree with the trial panel that the accused was not entitled to retain that part of the $9,000 which he had not earned in fees and which Damskov had requested that he return.[4]

## THE HEMSTREET MATTER

### 1. THE FACTS

The accused represented Mark Hemstreet in a case that resulted in a judgment of $9,896.49 in Hemstreet's favor.

---

[3] The accused relies on ORS 112.425(1), which provides:

"A person having custody of a will, other than an executor named therein, shall deliver the will, within 30 days after the date of receiving information that the testator is dead, to a court having jurisdiction of the estate of the testator or to an executor named in the will."

By its own terms, that provision applies only to a will in force at the time of the testator's death. It is no license to a person in the position of the accused to hold on to the will under all other circumstances.

[4] Before this court, the accused also contends that he withheld the $9,000 to "establish the fact that Mrs. Damskov did not know the extent of her assets" by demonstrating that she would not notice the discrepancy between the $36,335 he had informed her that she would receive from her sister's estate and the $27,335 actually listed in his accounting. It is difficult to take this explanation seriously but, even if it were believed, it would not justify the accused's violation of the mandatory language of *former* Disciplinary Rules 9-102(B)(3) and (4). If a lawyer wishes to test a former client's intellectual capacities, the testing had best be done with something other than the client's money.

The accused received a check for that amount, payable to both himself and Hemstreet. He sent the check to Hemstreet for his endorsement. Hemstreet's secretary sent the check back unendorsed, with instructions to endorse the check and return it to Hemstreet. The accused then endorsed his own name and that of Hemstreet and cashed the check. He deposited the funds in his trust account. He withdrew $6,000 from the account and retained that amount in payment of attorney fees. He wrote a check for the remaining $3,896.49 and sent it to Hemstreet.

Hemstreet returned the check, objecting to "the method and nature in which you have negotiated a joint check which was made out to me and you." Hemstreet requested that the accused send him a check for the entire amount of the judgment. He offered to pay the court-approved attorney fees of $2500 plus costs and disbursements of $307.40, and to consider additional billings submitted by the accused.

The accused returned the $3,896.49 check to Hemstreet accompanied by a letter stating that, "I became aware about 6-8 months ago that you were planning to 'stiff me' on my fee." To prevent that occurrence, the accused explained, he endorsed the check and retained an amount sufficient to cover his attorney fees.

After further exchanges of letters, Hemstreet filed a complaint with the Bar. The accused subsequently wrote to Hemstreet's lawyer, agreeing to settle the claim, but adding the condition that "Mr. Hemstreet will agree not to testify against me should the Bar elect to ignore his request and continue the disciplinary proceedings." Hemstreet's lawyer responded that Hemstreet "cannot lawfully agree to [that condition]." The parties subsequently settled and Hemstreet notified the Bar that he withdrew all charges against the accused.

## 2. THE CHARGES

### a. The accused's action in endorsing the check and retaining $6,000

With regard to the check, the accused is charged with violating *former* DR 1-102(A)(4), which provided:

"A lawyer shall not:

"* * * * *

"(4)   Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."[5]

In addition, the accused is charged with violating *former* DR 9-102(A), which provided, in part:

"All funds of clients paid to a lawyer or law firm, including advances for costs and expenses, shall be deposited in one or more identifiable trust accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:

"(1)   Funds reasonably sufficient to pay account charges may be deposited therein.

"(2)   Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved."[6]

The trial panel found that the accused had no express or implied authority to endorse Hemstreet's name to the check. We agree that Hemstreet did not authorize the accused to endorse his name on the check. The letter from Hemstreet's secretary to the accused authorized the accused to endorse his own name only and instructed him to return the check for Hemstreet's endorsement.

The accused contends, nevertheless, that he had statutory authority to endorse his client's name under ORS 87.430, which provides:

"An attorney has a lien for compensation whether specially agreed upon or implied, upon all papers, personal property and money of the client in the possession of the attorney for services rendered to the client. The attorney may retain the papers, personal property and money until the lien created by this section, and the claim based thereon, is satisfied, and the attorney may apply the money retained to the satisfaction of the lien and claim."

---

[5] In 1985, DR 1-102(A)(4) was amended in an immaterial particular and renumbered as DR 1-102(A)(3).

[6] In 1985, DR 9-102(A) was amended in an immaterial particular and renumbered as DR 9-101(A).

Under ORS 87.430, the accused had a right to retain the check until his claim for attorney fees was satisfied. That statute, however, does not authorize endorsement of the check. The accused acted without authority when he endorsed Hemstreet's name on the check.

In *In re Sassor,* 299 Or 570, 576, 704 P2d 506 (1985), this court held that a lawyer who endorsed his client's former husband's name to a check without authorization engaged in misrepresentation in violation of *former* DR 1-102(A)(4). In that case, the accused "believed that the check had been delivered to his client with authority to endorse the check and that his course of action was in compliance with the decree of dissolution." This court, however, concluded that the accused violated *former* DR 1-102(A)(4), noting that:

"There is no evidence that the accused intended to keep the money for himself, but the record is clear that the accused knew he had no authority from his client's former husband to sign the husband's name to the check." 299 Or at 576.

Here, the accused knew that Hemstreet did not authorize him to endorse the check. He argues that he believed that he had authority pursuant to ORS 87.430 to do so, and, therefore, lacked the requisite mental state to commit a violation of *former* DR 1-102(A)(4). In *Sassor,* we rejected a similar argument by the accused that he believed he had authority to endorse a check in his client's husband's name. The statute upon which the accused here relies does not expressly authorize endorsement, nor does it so readily lend itself to that interpretation that the accused reasonably could infer that endorsement was authorized. We find that, in endorsing Hemstreet's name without authorization, the accused committed a misrepresentation proscribed by *former* DR 1-102(A)(4).[7]

The trial panel, apparently inadvertently, made no specific finding on the charge that the accused violated *former*

---

[7] The accused also argues that, in order to commit a misrepresentation by unauthorized endorsement, he must have acted with intent to injure or defraud, a necessary element of the crime of forgery. *See* ORS 165.007 to 165.013. As noted, in *In re Sassor,* 299 Or 570, 576, 704 P2d 506 (1985), we found the accused guilty of misrepresentation even though he did not intend to keep the money for himself and believed that his action in endorsing the check was in compliance with the decree of dissolution in his client's case. Under *Sassor,* all that is required is that the accused know that the endorsement is unauthorized.

DR 9-102(A) by withdrawing $6,000 from his trust account for attorney fees even though, by his own admission, he anticipated a fee dispute. We find that, in so doing, the accused violated *former* DR 9-102(A).

### b. Engaging in conduct prejudicial to the administration of justice

Finally, as a result of his negotiations with Hemstreet, the accused was charged with violating *former* DR 1-102(A)(5), which provided:

"A lawyer shall not:

"* * * * *

"(5) Engage in conduct that is prejudicial to the administration of justice."[8]

The accused argues that:

"The key fact is that the alleged wrongful act never occurred. The Accused made a request which was rejected. The Accused accepted the rejection. The conduct which is claimed to be prejudicial to the administration of justice did not affect the administration of justice at all."

That the accused's actions did not achieve their purpose is immaterial. An attempt to induce a potential witness not to testify, even if unsuccessful, is "prejudicial to the administration of justice." *Cf.* ORS 162.285 (witness tampering includes an attempt to induce a witness not to testify in any official proceeding).

The more difficult question is whether the bar proceeding below was in furtherance of the "administration of justice" within the meaning of *former* DR 1-102(A)(5). In *In re Brown,* 298 Or 285, 297, 692 P2d 107 (1984), this court held that a lawyer who induced his client to sign a false affidavit for the purpose of persuading the Bar to discontinue an investigation did not violate *former* DR 1-102(A)(5):

"We find [the accused] not guilty of [violating] DR 1-102(A)(5) because the Bar has not cited to us any authority to the effect that a bar proceeding comes within the meaning of 'administration of justice' as set out in that rule. This question has not been argued or briefed."

---

[8] In 1985, DR 1-102(A)(5) was amended in an immaterial particular and renumbered as DR 1-102(A)(4).

In its brief to this court, the Bar cites two cases from other jurisdictions finding violations of the prohibition against engaging in conduct prejudicial to the administration of justice in matters relating to bar proceedings. *Toledo Bar Association v. Viren,* 25 Ohio St 3d 200, 496 NE2d 243 (1986) (failure to cooperate in bar investigation or to attend the formal hearing before the bar's grievance committee); *In re Howe,* 257 NW2d 420 (ND 1977) (deliberate failure to disclose military records in application for admission to the bar). We note also *Matter of Kleindienst,* 132 Ariz 95, 644 P2d 249 (1982) (false statements in depositions given during the course of bar disciplinary proceedings violated prohibition against engaging in conduct prejudicial to the administration of justice). None of these cases contains any reasoned analysis explaining why the "administration of justice" language should include bar proceedings. Upon reflection, however, we conclude that it does.

Bar disciplinary proceedings, although *sui generis* in nature, strongly resemble judicial proceedings in that they primarily involve factual adjudications. Testimony is given under oath and is subject to criminal sanctions for perjury. A witness who refuses to comply with a subpoena is subject to "the same orders and penalties to which a witness before a circuit court is subject." ORS 9.534(4)(b); BR 4.5(e)(2). In addition, the issues in bar disciplinary proceedings directly and significantly affect not only members of the Bar but the general public as well. Inducing, or attempting to induce, a witness not to testify circumvents the primary purposes of bar disciplinary proceedings — to protect the public from and otherwise to deter unethical conduct by attorneys. Finally (and, perhaps, most to the point), bar disciplinary proceedings determine whether an accused is fit to practice law in the courts of this state — a question as close to the heart of the "administration of justice" as any could be. We conclude that bar proceedings further "the administration of justice" within the meaning of *former* DR 1-102(A)(5),[9] and the accused is guilty of violating that rule.

---

[9] The accused analogizes his conduct to a civil compromise in certain criminal cases, *see* ORS 135.703 to 135.709, and to settlements in civil cases. This method of resolving "private disagreements," he argues, should be encouraged. Because bar disciplinary proceedings cannot be compromised, BR 2.6, his argument is not well taken.

In conclusion, we find the accused not guilty of violating DR 7-104(A)(1). The accused is guilty of violating *former* Disciplinary Rules 9-102(B)(3) and (4), 1-102(A)(4), 9-102(A) and 1-102(A)(5). We turn to the appropriate sanction to be imposed.

## SANCTION

The accused is guilty of five separate ethical violations. The most serious of these were his failure to account to Damskov for the sum of $9,000 and his unauthorized endorsement of Hemstreet's name and subsequent withdrawal of $6,000 from his trust account, even though he knew there would be a dispute over his attorney fee. On those occasions, the accused sought to protect his own financial interests at the expense of the duty owed to his clients. We are mindful as well that the accused still fails to appreciate the seriousness of his conduct on those occasions.

The Bar argues that the accused's conduct warrants a suspension for a period of two years. However, in light of the accused's general good reputation, lack of previous disciplinary action, and his cooperation with the investigating committee, we agree with the trial panel that a suspension for a period of six months is appropriate.[10]

The accused is suspended for a period of six months commencing on the effective date of this opinion. The Oregon State Bar is awarded its actual and necessary costs and disbursements.

---

[10] We commend the trial panel and the parties for focusing, in their discussion of sanctions, on the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1985). That methodology, first used by this court in *In re Bristow,* 301 Or 194, 206-7 n 3, 721 P2d 437 (1986), is of material assistance to us in setting an appropriate sanction. *See also In re Germundson,* 301 Or 656, 664, 724 P2d 793 (1986); *In re Luebke,* 301 Or 321, 332-37, 722 P2d 1221 (1986).