Argued and submitted March 6, 1996, accused suspended for 120 days May 8, reconsideration denied June 17, 1997

In re Complaint as to the Conduct of

# LARRY O. GILDEA,
*Accused.*

(OSB 92-125; SC S42543)

936 P2d 975

David Jensen, of Jensen, Fadeley & Elmore, P.C., Eugene, argued the cause and filed the briefs for the accused.

F. William Honsowetz, of Lombard, Gardner, Honsowetz, Brewer & Potter, Eugene, argued the cause for the Oregon State Bar. With him on the brief was Chris Mullman, Assistant Disciplinary Counsel, Lake Oswego.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Graber, and Durham, Justices.*

PER CURIAM

---

* Unis, J., retired June 30, 1996, and did not participate in this decision; Fadeley, J., did not participate in the consideration or decision of this case.

## PER CURIAM

In this lawyer disciplinary proceeding, the Oregon State Bar (the Bar) filed an amended formal complaint against the accused on March 3, 1995. The complaint consisted of five causes that alleged a total of 14 violations of the Code of Professional Responsibility (DRs) and two violations of ORS 9.527(4).[1] The accused denied all the allegations. Following a six-day hearing, a trial panel found the accused guilty of four violations of the Code of Professional Responsibility and selected a one-year suspension as the appropriate sanction.[2]

Because the accused's suspension was for more than 60 days, this court automatically reviews that decision *de novo* on the record. ORS 9.536; Bar Rules of Procedure (BRs) 10.1 and 10.6. In his petition to this court, the accused challenges the trial panel's finding of guilt only with respect to one of the disciplinary rules, DR 9-101(C)(3). In addition, the accused challenges his one-year suspension as being too severe. The Bar, on cross-petition for review, seeks disbarment on the ground that the accused is guilty of violating several disciplinary rules in addition to those found by the trial panel. Most significantly, the Bar asserts that the accused stole from his client.

We hold that the Bar has failed to establish that the accused stole from his client. However, we conclude that, in addition to those violations that were found by the trial panel, the accused violated four other disciplinary rules. Finally, we conclude that, based on the violations committed and applicable precedent, the appropriate sanction is a 120-day suspension from the practice of law.

---

[1] The Bar's amended complaint alleged that the accused violated the following provisions: DR 1-102(A)(3) (three counts); DR 5-101(A) (two counts); DR 5-101(B) (two counts); DR 5-104(A); DR 9-101(A) (three counts); and DR 9-101(C)(3) (three counts). The text of those provisions, as well as ORS 9.527(4), is set out below. In several instances, the complaint did not refer to the versions of the DRs that were in effect at the time that the alleged violations occurred. However, those DRs have not changed in any material way with respect to his alleged violations. Therefore, for ease of reference and sake of clarity, we refer to the DRs as alleged in the Bar complaint.

[2] At the close of evidence, one count of both DR 1-102(A)(3) and ORS 9.527(4) were dismissed.

## FACTUAL FINDINGS

All the issues and charges in this case arise out of the accused's friendship with and representation of Margaret Benston (Benston). The accused represented Benston with respect to various matters from approximately 1965 until her death on May 12, 1992. Throughout that time, and until her death, the accused and Benston were close friends. The matters relevant to this proceeding occurred during the years 1988 through 1991.

In 1988, the accused began working on two property foreclosures for Benston. In October 1988, the accused and his wife became concerned about Benston's health. The accused brought Benston to Eugene, where the accused lived, to meet with Dr. England. Benston was preliminarily diagnosed as having Alzheimer's disease, but that diagnosis later was changed to multi-infarct dementia. Dr. England and the accused agreed that Benston should be placed in a foster home. Within days, Benston moved into foster care, where she remained for two and one-half months. While living there, Benston visited the accused's family on weekends, holidays, and other special occasions. She was unhappy in foster care, and her conduct was disruptive. Although she was lucid while visiting the accused's home, Benston relapsed into varying states of dementia while at her foster home.

In January 1989, Benston moved to Riverpark Care Center, which provided assisted living units for residents. She remained there until her death. Benston initially showed marked improvement at Riverpark—her conduct was not disruptive and she was able to handle her daily affairs. By October 1991, however, her condition had deteriorated, and she was moved to a dementia unit at Riverpark. The following transactions occurred between Benston and the accused while she resided at Riverpark:

1. *General Power of Attorney*

Benston and the accused agreed that Benston would give the accused a power of attorney over her affairs. The accused prepared a power of attorney document and had Benston sign it at his office. However, the accused's secretary, Charlotte Stirling, refused to notarize the document,

because she did not believe that Benston was competent to sign. The accused drafted a second power of attorney, which he delivered to Riverpark with instructions to have Benston sign it, if the Riverpark staff believed that she was competent to do so. Three Riverpark personnel witnessed Benston sign the document; they believed that she was competent.[3]

## 2. *Financial Matters*

Also during her stay at Riverpark, Benston asked the accused to take over maintenance of her financial matters. Benston would endorse checks over to the accused. The accused then would place those checks into his general client trust account, and Benston's bills were paid out of that account. In addition to that arrangement, the accused set up a separate trust account for Benston in her name. Income from Benston's property dealings typically was placed in that separate trust account. The accused visited Benston regularly and discussed her financial matters with her, but he did not provide Benston with written summaries of income and disbursements.

On December 5, 1988, the accused transferred $2,212.95 from Benston's trust account to his firm's account. On December 20, 1988, the accused transferred $5,000 into his firm's account from Benston's trust account. On January 19, 1989, the accused transferred another $1,000 from the account into his firm's account. The accused variously described those transfers as "advances on fees" and "flat fees." A ledger entry (whose accuracy the accused denies) described one of the transfers as a "loan." The accused acknowledged that all those payments were advances for fees, for work not yet performed, that he needed to pay operating expenses at his firm. The accused discussed the transactions with Benston in advance, but he neither told Benston to seek independent legal advice before agreeing to the transfers nor memorialized the transactions by written agreements with Benston.

---

[3] The accused did not instruct Benston to seek independent legal advice before signing the document, nor did he instruct her that the power of attorney created a potential conflict of interest for the accused. However, the Bar did not allege that the failure to advise Benston violated a rule of professional responsibility. No issue as to that question is before us.

One other financial transaction is pertinent here. A check for $321.34, dated August 13, 1991, and sent to the accused as final payment for certain property in Florence that Benston had sold, was deposited into the accused's personal account instead of into Benston's trust account, where the accused had placed previous trust deed property contract payment checks. The deposit was made, without the accused's knowledge, by the accused's daughter, who was serving as the accused's bookkeeper at the time.

### 3. *Real Estate*

The accused personally guaranteed Benston's payments to Riverpark. The accused used the Benston power of attorney to assign to himself a trust deed on Benston's Florence property. There was no consideration given by the accused to Benston in exchange for that assignment. The accused assigned the trust deed to himself to ensure that future monthly payments on the property would not go as reimbursements to Medicaid but would, instead, continue to be applied to Benston's Riverpark payments. Although Benston agreed to that arrangement, the accused did not instruct her to seek independent legal advice from another lawyer, nor did he explain in writing the conflict of interest that such an arrangement created. All the money that the accused acquired under the Florence property contract payments either was applied to Riverpark payments or was placed in Benston's trust account.

### 4. *Personal Property*

When it became apparent that Benston would not be returning to her Florence home, she asked the accused to clean out the home, discard any useless property, and bring the remaining possessions to Eugene. The accused in turn asked his housekeeper, Cynthia Stillman, to perform that task. Stillman and her husband cleaned out the home, threw out various items, and returned to Eugene with most of the furniture and other property, such as dishes and glassware. Neither the Stillmans nor the accused inventoried the property. Some of the property was placed in Benston's new accommodations. The accused stored the balance of property at his home and at his office without charge.

In March 1992, the accused had a garage sale of his own property and, with Benston's oral approval, included Benston's stored property in the sale. The accused had two antique dealers examine Benston's property and assist in its valuation. Stillman organized and conducted the sale. She kept a ledger that distinguished payments for the accused's property and Benston's property. After paying a 20 percent commission to Stillman for her work, the accused placed the remaining proceeds from Benston's property into her trust account.[4] Benston's property never was inventoried before the sale, nor did the accused provide Benston with an accounting of the property sold.

5. *Automobile*

Shortly after Benston was moved to Eugene, and at her request, the accused brought her 1976 Volkswagen van to his home. The van was in poor repair, and the accused had it cleaned and repaired at his own expense. Although Benston no longer had a driver's license, she had a strong attachment to the van and enjoyed seeing and riding in it when she visited the accused's home. Because Benston had no license, she could not get insurance on the van. Pursuant to a recommendation from the accused's insurance broker, Benston and the accused agreed to transfer the title of the van to the accused's professional corporation for the purpose of obtaining insurance on it. On November 12, 1989, the accused had Benston sign a power of attorney in favor of the accused for the purpose of transferring title to the van. The transfer was completed that same day. No consideration was paid for the van. The accused did not advise Benston to seek advice from another lawyer before signing the power of attorney or transferring title.

In the summer of 1991, Benston orally agreed to sell the van to the accused's daughter for $1,000. The daughter did not have the full amount at that time, so Benston, the accused, and his daughter agreed that she would pay $100

---

[4] The amount of proceeds reflected in the ledger equaled $738.50. Of that, $147.70 was subtracted for Stillman's fee. That would have left $590.80. However, the accused placed $1,141 into Benston's trust account as her proceeds from the sale. The accused testified that he learned of that overpayment only upon reviewing his records in preparation for the trial panel's proceeding.

per month. On August 13, 1991, title to the van was transferred from the accused's professional corporation to the accused's daughter. No consideration was paid at that time. On September 9, 1991, the accused paid $2,000 of his own money into Benston's trust account to cover payments due to Riverpark. Because he considered this payment to cover the $1,000 owed Benston for the van, the accused instructed his daughter that she no longer needed to pay Benston.

## ANALYSIS:
### Violations Found by Trial Panel

The accused does not dispute that he violated DR 9-101(A)[5] by failing to deposit the $321.34 check, which was the final payment to Benston from a contract sale of her Florence property, into his client trust account. We find that the Bar proved that the accused is guilty of that violation.

Neither does the accused dispute that he violated DR 5-101(A)(1)[6] and DR 5-104(A)[7] by failing to make full disclosure to Benston of the possible conflict of interest in assigning Benston's trust deed on the Florence property to himself. We find that the Bar proved that the accused is guilty of those violations as well.

The accused argues that the trial panel erred in concluding that he violated DR 9-101(C)(3)[8] by failing to inventory Benston's personal property either before or in connection with the garage sale. The accused argues that Stillman

---

[5] DR 9-101(A) provides, in part:

"All funds of clients paid to a lawyer or law firm, including advances for costs and expenses and escrow and other funds held by a lawyer or law firm for another in the course of work as lawyers, shall be deposited and maintained in one or more identifiable trust accounts in the state in which the law office is situated."

[6] DR 5-101(A)(1) provides, in part:

"Except with the consent of the lawyer's client after full disclosure,

"(1) a lawyer shall not accept or continue employment if the exercise of the lawyer's professional judgment on behalf of the lawyer's client will be or reasonably may be affected by the lawyer's own financial, business, property, or personal interests."

[7] DR 5-104(A) provides:

"A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise the lawyer's professional judgment therein for the protection of the client, unless the client has consented after full disclosure."

[8] DR 9-101(C)(3) provides, in part, that "[a] lawyer shall":

was responsible for the garage sale and that, if anyone should have conducted an inventory, it was Stillman. The accused further argues that, with respect to that matter, he acted in his personal capacity, not pursuant to a lawyer/client relationship, and therefore was not obligated to inventory the property. The accused's arguments are unpersuasive.

■■    This situation exemplifies the dangers inherent in providing legal representation to a friend. In matters where the client/friend's legal and financial interests are concerned, a lawyer runs the risk that he or she will be deemed to have acted in the lawyer's professional capacity. In considering whether a lawyer's services were provided in a personal or professional capacity, the accused mistakenly assumes that *his* belief with respect to the nature of those services is dispositive. That is incorrect. Rather, it is the *client's* reasonable expectations that are the dispositive consideration.

In *In re Harrington*, 301 Or 18, 718 P2d 725 (1986), this court was required to determine whether a lawyer had acted in his professional or personal capacity in a transaction involving a client. The lawyer represented an elderly woman in her legal matters and became a close friend and confidant as well. During one of their many visits, the lawyer mentioned that he was in need of $5,000 and indicated that he might have to sell some of his stock to get it. The friend offered to loan him the money; the lawyer drafted the documents that memorialized the transaction. The lawyer was charged with violating *former* DR 5-104(A) (business relations with a client); he defended against the charge by arguing that the loan arose out of his friendship with the client and that he acted in his personal capacity with respect to it.

This court disagreed, finding that the lawyer had acted in his professional capacity. In so holding, the court relied on the following passage from *In re Montgomery*, 292 Or 796, 804, 643 P2d 338 (1982), *quoted in Harrington*, 301 Or at 25:

" '[W]hen a lawyer seeks to borrow money from a non-lawyer client * * *, the lawyer must assume, in the absence of

---

"Maintain complete records of all funds, securities and other properties of a client coming into the possession of the lawyer and render appropriate accounts to the lawyer's client regarding them."

contrary expression by the client, that the client is relying on the lawyer for professional judgment to the same extent that the client would rely on the lawyer for advice had the client consulted the lawyer concerning such a loan to a third person.' "

Although this case involves the sale of a client's personal possessions rather than a loan, we believe that the same analysis applies. Just as in *Harrington*, the client's financial interest was at stake, and the lawyer had provided professional services with respect to numerous other financial matters of the client. In the absence of evidence that Benston did *not* rely on the accused in his professional capacity, she is deemed to have done so. Because no such evidence has been presented, the accused cannot avoid the requirements of DR 9-101(C)(3) by asserting that he was acting in his personal capacity, and not as her lawyer, with respect to the transfer, storage, and sale of Benston's possessions.

■ Neither can the accused argue that Stillman, not the accused, was responsible for making the inventory. As the lawyer for Benston, the ultimate responsibility for carrying out an inventory rested with the accused. The failure of Stillman to make an inventory at the time of moving the personal property to Eugene, or at the time of the garage sale, does not absolve the accused from his ultimate responsibility.

■ Finally, the accused argues that DR 9-101(C)(3) does not require an accounting, unless there has been a request for one from the client. The accused is mistaken. DR 9-101(C)(3) provides that a lawyer not only shall "maintain complete records of all funds, securities and other properties of a client coming into possession of the lawyer," *but also* "render appropriate accounts to the lawyer's client regarding them." The text makes clear that a lawyer must render all "appropriate" accounts. That requirement, by its terms, is not preconditioned on a client's first asking for an accounting. In contrast, the immediately following provision, DR 9-101(C)(4), expressly requires that a lawyer promptly pay or deliver to a client funds or property of the client, *as requested by the client*. We think that the term, "appropriate," unambiguously refers to the *form* of the account that must be rendered, not to whether it must be rendered at all.[9] We find that the Bar

---

[9] This court's prior cases that have found violations of DR 9-101(C)(3) (or its predecessor) for failure to render an accounting, typically have involved situations

proved that the accused violated DR 9-101(C)(3) when he failed to render *any* accounting to his client.[10]

The foregoing discussion encompasses all the violations of the disciplinary rules that were found by the trial panel. We turn now to a determination whether, as the Bar argues, the accused should be found guilty of additional violations.

### 1. *DR 9-101(C)(3)*

The Bar argues that the accused violated DR 9-101(C)(3) by failing to render an accounting of the $321.34 check that was inadvertently placed in the accused's personal account. For the same reason as previously discussed, the Bar's argument is well taken. The check came into the accused's possession by way of a final payment for certain property. The accused failed properly to account for the check. We note that, had the accused accounted for the check, the mistake of placing the check in the accused's personal account might have been avoided. We find that the Bar proved that the accused violated DR 9-101(C)(3) in this regard.

### 2. *DR 5-101(B)*

The Bar argues that, in addition to violating DR 5-101(A) and 5-104(A), as found by the trial panel, the accused also violated DR 5-101(B)[11] by preparing an instrument—the assignment of the trust deed—that gave him a gift. The Bar reasons that, because the accused personally had guaranteed payments to Riverpark, he ultimately would have been

---

in which the lawyer failed to respond to a client's request for an accounting. *See, e.g., In re Sousa*, 323 Or 137, 915 P2d 408 (1996); *In re Hedges*, 313 Or 618, 624, 836 P2d 119 (1992); *In re Boothe*, 303 Or 643, 649, 740 P2d 785 (1987). But those cases do not support the proposition that the rule cannot be violated *unless* a client has requested an accounting.

[10] The accused also argues that the rule is too vague to be enforced against him, because it does not specify *whether* and, if pertinent, *when* an accounting is to be made. Whatever efficacy it might have in other circumstances, that argument cannot aid the accused here, because the rule clearly requires an accounting at *some* time, and the accused *never* made one.

[11] DR 5-101(B) provides:

"A lawyer shall not prepare an instrument giving the lawyer or a person related to the lawyer as parent, child, sibling, or spouse any substantial gift from a client, including a testamentary gift, except where the client is related to the donee."

responsible for any default. The Bar reasons that, by assigning the trust deed to himself, the accused was protecting himself from the possibility that Medicaid would acquire any funds derived from the trust deed, thus leaving the accused responsible for Benston's debt at Riverpark.

We agree with that argument. In doing so, we accept the accused's testimony that his purpose for assigning the trust deed was to ensure future payments to Riverpark. But that purpose, coupled with the accused's status as guarantor of Benston's Riverpark obligation, demonstrates why the assignment was a gift to the accused for purposes of DR 5-101(B). The funds collected under the assignment took the accused "off the hook" to some degree. The accused was aware of the pertinent facts when he prepared the assignment. We hold that he is responsible for the necessary legal effect of that assignment.

In so holding, we are mindful that the accused does not appear consciously to have considered the transaction a gift.[12] Indeed, after the gift was made, the accused placed the funds that he received on the trust deed into Benston's trust account, once he was sure that Medicaid would not take those funds. But the accused's subsequent acts, while perhaps relevant to the question of sanction, cannot change the legal effect of the preparation of the assignment.

We find that the accused violated DR 5-101(B) when he prepared the assignment of the trust deed.

3. *DR 1-102(A)(3); ORS 9.527(4); DR 5-101(A); DR 5-101(B)*

The Bar argues that the accused violated DR 1-102(A)(3)[13] and ORS 9.527(4)[14] by dishonestly transferring

---

[12] The accused does not argue that, and we therefore do not address whether, the concept of "gift" in DR 5-101(B) includes all the common-law elements of gift, *viz.*, donative intent, delivery, and acceptance.

[13] DR 1-102(A)(3) provides that "[i]t is professional misconduct for a lawyer to":

"Engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

[14] ORS 9.527(4) provides several grounds for disbarment, suspension, or reprimand, including, as pertinent here, where

"[t]he member is guilty of willful deceit or misconduct in the legal profession[.]"

the van, first to his professional corporation and then to his daughter, and that he violated DR 5-101(A) and (B) by engaging in conflicts of interest with respect to the transfer.

■ The Bar's claims with respect to DR 1-102(A)(3) and ORS 9.527(4) are not well taken. The Bar has not proved by clear and convincing evidence that the accused engaged in fraud, dishonesty, or misrepresentation concerning the transfer. The accused discussed the initial transfer of the van to his professional corporation with Benston, and had her sign a Department of Motor Vehicles power of attorney in his favor. The purpose of the transfer was to enable the accused to purchase insurance on the vehicle, because Benston was unable to obtain insurance. In the light of the fact that the accused and his family drove Benston in her van when she visited their home, this effort to acquire insurance was both reasonable and prudent.

Neither did the subsequent transfer of title from the accused's professional corporation to the accused's daughter involve fraud, dishonesty, or misrepresentation. The record indicates that Benston willingly agreed to the sale of "her" van—although, technically, it then was owned by the accused's professional corporation—to the accused's daughter for $1,000. Benston received $1,000 as payment for the van.[15] The accused did not violate DR 1-102(A)(3) or ORS 9.527(4) concerning this matter.

■ On the other hand, the Bar's claims with respect to DR 5-101(A) leads to an analysis and a result like that reached with respect to the assignment of the trust deed. The Bar proved by clear and convincing evidence that the accused violated DR 5-101(A) by failing to obtain consent from Benston after full disclosure of the conflict of interest involved in transferring title to Benston's van to the accused's

---

[15] The Bar argues that the $1,000 was paid only after the accused learned that a Bar complaint had been filed against him and that the payment would not have occurred otherwise. The accused's daughter testified that she had agreed to pay Benston $100 a month until the $1,000 was paid in full. The accused's $1,000 payment occurred less than one month after the transfer of the van to the daughter. Although it is true that this payment occurred after the filing of a complaint against the accused, the proximity in time of the payment to the transfer of title persuades us that the accused and his daughter always intended to pay Benston $1,000 for the vehicle.

professional corporation. The fact that the accused's professional corporation paid the insurance on the vehicle, and that Benston ultimately was paid $1,000 for it, did not eliminate the conflict of interest.

Finally, we hold that the accused did not violate DR 5-101(B), because we find that the transfer of the van, first to the professional corporation and then to the daughter, did not constitute a gift. Although the professional corporation did not pay consideration for the transfer, the van essentially was held in trust for Benston and was operated for her benefit. Moreover, upon selling the vehicle to the daughter, the professional corporation did not receive the $1,000 payment for the vehicle; the money went to Benston.

In summary, we hold that the trial panel correctly concluded that the accused did not violate DR 1-103(A), ORS 9.527(4), or DR 5-101(B), but we find that, in addition, the Bar proved by clear and convincing evidence that the accused violated DR 5-101(A).

### 4. *DR 9-101(A); DR 9-101(C)(3); DR 1-102(A)(3)*

The Bar argues that the accused violated DR 9-101(A) by failing to maintain all of Benston's funds in one or more identifiable trust accounts and that he violated DR 9-101(C)(3) by failing to maintain adequate records and properly to account for those funds. In addition, the Bar claims that the accused violated DR 1-102(A)(3), by fraudulently converting some of Benston's funds to his own use without her prior written consent. Those claims concern the accused's handling of all Benston's funds, but the parties have focused primarily on a series of withdrawals from Benston's trust account that occurred in December of 1988 and January of 1989.[16]

---

[16] The parties dispute whether the withdrawals should be construed as loans, advances on fees, or flat fees. The Bar argues that the accused characterized the withdrawals in all three ways, and that the flat fee characterization was asserted for the first time at trial. We do not need to distinguish among those characterizations because, for the purposes of this case, the same legal result follows, regardless of the characterization.

■ The record does not indicate that the accused failed to deposit funds into Benston's trust account concerning those claims.[17] Therefore, the Bar's claim with respect to DR 9-101(A) is not well taken. However, the Bar's claim with respect to DR 9-101(C)(3) is well taken. Although the accused testified that he had discussed the withdrawals with Benston in advance, he did not render an accounting of those withdrawals after the funds had been removed from Benston's trust account, as required by that rule. We find that the Bar proved that the accused violated DR 9-101(C)(3) in that respect.

■ The most serious claim made by the Bar is that the accused converted Benston's funds without prior consent from Benston and that the conversions were fraudulent and in violation of DR 1-102(A)(3). The Bar argues that there is no indication in the record, other than from the accused's own testimony, that he had discussed those withdrawals with Benston in advance. The Bar argues that, in the absence of any independent evidence to corroborate the accused's testimony, we should presume that the accused never received consent from Benston for the transfers before they were made. The Bar argues that any other result would leave it helpless in pursuing matters of this kind, because an accused could make up any story that he or she wished. We are not persuaded.

We note, first, that *the Bar* has the burden of proving by clear and convincing evidence that the accused violated a rule of professional conduct. BR 5.2. The accused does not have the burden of proving that he *did not* commit the violation. Yet, the Bar's blanket approach would have the effect of shifting the burden to the accused to disprove the charge. Under the Bar's formula, the accused would have to produce independent corroborating evidence in support of his testimony or be found guilty. That approach is contrary to the specific way the burden of proof is assigned in these cases.

---

[17] Our earlier conclusion that the accused violated DR 9-101(A) applied only to the $321.34 check that never was placed into Benston's trust account.

The question, therefore, is whether *the Bar* proved by clear and convincing evidence that the accused violated DR 1-102(A)(3). To answer that question, this court must look to *all* the evidence in the record pertaining to that charge. In this case, that evidence includes the accused's testimony.[18]

Second, the Bar is not doomed to failure merely because the accused's own testimony may be considered and relied on. A trial panel or this court is free to find the testimony of an accused lawyer credible or not credible based, *inter alia*, on the accused's demeanor and other evidence relating to the matter.

The pertinent evidence concerning this matter is as follows: On December 5 and 20, 1988, and January 19, 1989, the accused transferred $2,212.95, $5,000, and $1,000, respectively, from Benston's trust account to his firm account. The accused testified that he discussed those transactions with Benston in advance and received her agreement before he transferred the funds from Benston's account to his firm account. In depositions, and at his hearing, the accused variously described those transfers as "advances on fees" and "flat fees." The accused testified that all the payments were advances for fees for work not yet performed that were needed to pay operating expenses at the firm. However, the accused conceded that he neither told Benston to seek independent legal advice before agreeing to the transfers nor memorialized the transactions through written agreements with Benston.

The Bar produced no evidence that the accused, in fact, did not receive permission to make those transfers in advance, or that he failed to perform the work that he promised in return for the transfers. Although we are not bound to rely on the accused's testimony regarding Benston's prior consent, we conclude that, in the light of the evidence and

---

[18] Although use of the accused's testimony for the purpose of establishing what Benston agreed to constitutes hearsay, hearsay is admissible in disciplinary proceedings so long as it "possesses probative value commonly accepted by reasonably prudent persons in the conduct of their affairs." BR 5.1; *In re Taylor*, 319 Or 595, 602 n 6, 878 P2d 1103 (1994). The accused's testimony meets that standard in this case.

particularly in the light of the accused's conduct in his relationship with Benston with respect to other matters, the accused's testimony may be relied on in this instance.[19] We note also that the trial panel similarly accepted the accused's testimony on this subject.

We agree with the trial panel that the Bar failed to prove that the accused violated DR 1-102(A)(3) with respect to this matter.

## 5. *DR 9-101(A)*

The Bar argues that the accused violated DR 9-101(A) by failing to maintain Benston's proceeds from the sale of her personal possessions in an identifiable trust account. We find that the accused did not violate that rule with respect to this matter.

## SANCTION

The trial panel recommended a one-year suspension, based on its conclusion that the accused violated DR 9-101(A), DR 9-101(C)(3), DR 5-101(A), and DR 5-104(A). In addition to those violations, we have found the accused guilty of violating DR 9-101(C)(3) on two other counts, DR 5-101(A) on one other count, and DR 5-101(B) on one other count, for a total of eight violations.[20] We are left to decide the appropriate sanction for those violations.

In deciding the appropriate sanction, we are guided by the American Bar Association's *Model Standards for Imposing Lawyer Sanctions* (1991) (ABA Standards). *In re Sousa*, 323 Or 137, 145, 915 P2d 408 (1996). Under those standards, we consider four factors: (1) the nature of the ethical duty violated, (2) the mental state of the accused at the time of the violation, (3) the extent of the actual or potential

---

[19] In its brief to this court, and at oral argument, the Bar put all its eggs in one basket by arguing solely that this court should not rely on the accused's own testimony. The Bar did not provide any evidence that the accused failed to perform work for the advanced fees, or any other evidence that may have placed the accused's testimony in doubt.

[20] Although we have found double the number of violations that were found by the trial panel, all but one of the additional violations were for conduct virtually identical to that for which the trial panel already had found the accused guilty.

injury caused by the accused's misconduct, and (4) any aggravating or mitigating circumstances. ABA Standard 3.0.

The matters at issue here involve the most important ethical duties under the standards of professional responsibility, *viz.*, those owed to a client. *Sousa*, 323 Or at 145. The accused violated his obligations to his client by failing to avoid conflicts of interest without the informed consent of his client and by assigning Benston's trust deed to himself. ABA Standard 4.3. He also violated his duty to Benston to safeguard her property by failing to have her personal possessions inventoried, by failing to account to Benston for money that he had received that was hers, and by depositing one check that was hers in his personal account. ABA Standard 4.1.

However, from our reading of the record, none of those violations was done by the accused with intent, *i.e.*, with the conscious objective or purpose to engage in those violations. *See Sousa*, 323 Or at 145; ABA Standard 7 (defining intent). Rather, the accused's conduct amounted to negligence. In addition, although the accused's improper conduct potentially could have caused significant injury to Benston's financial interests, no actual injury to her financial interests has been shown.

With respect to aggravating and mitigating factors, we note this court's disposition of *Harrington*. In assessing the appropriate sanction, the court stated:

> "The present case involves more than a single violation. Each of the violations is a serious matter. However, we find that the accused acted in the utmost good faith throughout his relationship with [the clients]. We do not doubt the accused's motivation arose from kindness * * *. [The clients] did not lose anything as a result of the accused's conduct. On the contrary, they were provided with many valuable services for which they were never charged. We find that the accused acted throughout without guile or improper motive."

301 Or at 34.

The foregoing statement applies to this case. Although the accused violated several disciplinary rules, we

are satisfied that he acted throughout in good faith and that he attempted to further Benston's best interests at all times. This amounts to an absence of a dishonest or selfish motive[21] under ABA Standard 9.32(b), and constitutes a significant mitigating circumstance.[22]

However, there also are aggravating circumstances. First, the accused had practiced law for many years when he committed the acts of professional misconduct.[23] ABA Standard 9.22(i). Second, the accused has a prior record of disciplinary problems, albeit a remote one, having received a private reprimand in 1972 from the Bar's disciplinary board. ABA Standard 9.22(a). However, we also note that the remoteness of that prior offense constitutes a mitigating factor. ABA Standard 9.32(m).[24] Third, due to her advanced age and poor health, Benston was particularly vulnerable. ABA Standard 9.22(h). Finally, the accused violated multiple disciplinary rules. ABA Standard 9.22(d).

ABA Standards 4.13 and 4.33 provide that, without consideration of aggravating and mitigating factors, a reprimand generally is appropriate when a lawyer is negligent either in dealing with a client's property in a way that causes potential injury to the client or in determining whether certain conduct causes a potential conflict of interest. The sanction in *Harrington* was a reprimand.

Although there are significant mitigating circumstances in this case, we conclude that, when viewed together

---

[21] The accused's assignment of the trust deed to himself *could* have been for a selfish motive, but we are satisfied from this record that the accused meant to benefit the client, not himself.

[22] The trial panel reached a similar conclusion:

"The Accused and Margaret Benston had been friends for many years, and the Accused did see that Margaret Benston sought medical assistance, placed her in appropriate care facilities, appears to have safeguarded her personal property and used it for only her benefit. The legal work that the Accused performed for Margaret Benston * * * appears to have been in Margaret Benston's best interest."

[23] The accused has been practicing law for over 30 years.

[24] The trial panel also cited a letter of admonition, received by the accused in 1982, as another prior offense. The accused acknowledged receiving the letter, but asserted that it did not constitute a prior disciplinary offense, because he disputed the letter and the matter was dismissed. We do not find that matter to be of sufficient moment to weigh in our assessment of the appropriate sanction.

with the aggravating circumstances, the facts still warrant more than a reprimand. However, we also conclude that the trial panel's selection of a one-year suspension was too severe. In our view, a 120-day suspension constitutes an appropriate sanction.

The accused is suspended from the practice of law for a period of 120 days commencing on the effective date of this decision.