Argued and submitted January 30, 1985, accused reprimanded April 22, 1986

In re Complaint as to the Conduct of
# FRANCIS E. HARRINGTON,
*Accused.*

## (OSB 82-4; SC S31056)

718 P2d 725

Thomas E. Cooney, Portland, argued the cause for the accused. With him on the brief was Cooney, Crew & Wihtol, Portland.

James S. Leigh, Portland, argued the cause for the Oregon State Bar. Also on the brief were Klarquist, Sparkman, et al, Portland, and Glenn H. Prohaska and Day, Prohaska, et al, Portland.

Before Peterson, Chief Justice, and Lent, Linde, Roberts*, Carson and Jones, Justices.

PER CURIAM

* Roberts, J., retired February 7, 1986.

## PER CURIAM

This is a lawyer disciplinary proceeding instituted by the Oregon State Bar in January 1983 against Francis E. Harrington. The Bar charges the accused with six causes of complaint, alleging 15 violations of the Code of Professional Responsibility (Disciplinary Rules). Five of the six causes of complaint arise out of the accused's association with a Mr. and Mrs. Burgard. The last cause of complaint stems from an unrelated probate matter. All charges involve alleged conduct which occurred between January 1979 and March 1981. As in all disciplinary cases, we review *de novo*. ORS 9.536(3). The Bar must prove each alleged violation by clear and convincing evidence.

## I.  THE BURGARD MATTERS.

Sometime in June 1975, Mr. and Mrs. Burgard, an elderly couple, were referred to the accused by their parish priest for assistance in the sale of some coastal property. The accused met with the Burgards in their home. He then prepared the necessary documents to complete the transaction. He charged the Burgards a fee of $85 for his services.

The accused, active in his church and other civic and charitable organizations, took a personal interest in aiding the Burgards, especially Mrs. Burgard, who was not readily able to get out and about. In the months and years following, the accused visited socially with the Burgards in their home and developed a close personal relationship as a friend and confidant of Mrs. Burgard. The Burgards were not willing or able to do for themselves many routine day-to-day activities such as banking. The accused testified that he stepped into the breach in respect of much of the Burgards' banking transactions and did errands and odd jobs "to the point of exhaustion."

The accused characterized his relationship with the Burgards as that of a "good Samaritan," "rendering many nonlawyer-like services to [Mrs. Burgard] out of friendship and Christian concern." Indeed, a review of the "services" provided by the accused shows a preponderance of activities that, although not inconsistent with an ongoing lawyer-client relationship, are not commonly thought of as the providing of legal services. For instance, on more than one occasion the accused was called because Mr. Burgard had fallen and injured

himself on one of his frequent shopping trips. Twice the accused was called to search the neighborhood for Mr. Burgard when the elderly gentleman failed to return home from shopping. When Mr. Burgard suffered a stroke, the accused went to the Burgards' home in the middle of the night to make arrangements for transportation and hospital care. The accused's wife transported Mrs. Burgard to and from the hospital to visit her husband. The accused also helped the Burgards with the maintenance of their automobile, the defrosting of their refrigerator and the purchase of home appliances. The most regular service provided to Mrs. Burgard by the accused appears to have been his handling of all her banking transactions.

During some of their social visits, the accused and Mrs. Burgard had discussions regarding a will. In August 1976, at Mrs. Burgard's request, the accused drafted a will and trust agreement, which documents were executed the same month. Under the will, Mrs. Burgard gave all of her estate to "FRANCIS E. HARRINGTON, IN TRUST" for Mr. Burgard should the latter survive her. The will also nominated Francis E. Harrington, "my attorney," as executor. The trust agreement named Francis E. Harrington, "Attorney at Law," as trustee with Mr. and Mrs. Burgard as beneficiaries. According to the accused's testimony, the trust agreement was to operate only if and when Mrs. Burgard became incapable of handling her own affairs. The accused did not bill Mrs. Burgard for preparation of these documents at that time. He did testify, however, that he believed that the documents required revision and that from time to time Mrs. Burgard contemplated changing both but could not make up her mind as to any preferred disposition of her assets.

Sometime prior to June 1977, Mrs. Burgard asked the accused to act under a power of attorney in her behalf. The accused explained to Mrs. Burgard that a power of attorney allowed him unlimited authority over her assets. He also explained the difference between an attorney in fact, *i.e.,* one "who had the agency powers to do anything that the principal could do," versus an attorney at law, and that, as her attorney in fact, he could operate without having to obtain her approval regarding the disposition of her assets. The accused testified that he told Mrs. Burgard that

"* * * *there were things that I could not do for her simply as a lawyer* because they had to come back to her, they had to have her approval. If I had Power of Attorney, there were many things I could do, I could do them when she might be disabled. One of the things I pointed out very strongly was the disablement clause." (Emphasis added.)

On June 30, 1977, the accused drafted a power of attorney, designating himself "attorney at law," as Mrs. Burgard's attorney in fact. Mrs. Burgard executed the power of attorney on the same day. The accused did not charge for drafting this document. Later, the accused characterized his conduct in exercising the power of attorney regarding at least one loan of Mrs. Burgard's funds to third parties as providing legal services to Mrs. Burgard. Between June 30, 1977, and November 1980, the accused borrowed $5,000 from Mrs. Burgard and participated in or arranged for three loans of Mrs. Burgard's funds to third parties. These transactions were the major focus of the Bar's complaint against the accused.

As mentioned above, the accused performed Mrs. Burgard's banking transactions for her. He characterized his duties as those of an errand boy in that he simply picked up her checks when she would call him, deposited them in her account, and then turned the deposit slips over to her or to her accountant. On some occasions, he merely would cash checks and return the money to Mrs. Burgard. From 1979, when the accused was appointed conservator for Mr. Burgard, until 1981, the accused also deposited checks for Mr. Burgard. For convenience, the accused was named as co-trustee with Mrs. Burgard on a number of her bank accounts and certificates of deposit. Some of the financial documents and instruments designated the accused as "attorney-trustee." The accused contended that this designation was drafted by bank personnel to reflect their assessment of his status as Mrs. Burgard's attorney in fact under the power of attorney.

For his conduct relating to his personal loan from Mrs. Burgard and his participation in the other three loans of Mrs. Burgard's funds to third parties, the accused was charged with violations of DR 5-101(A), 5-104(A), 5-105(A), (B) and (C), and 9-102(B)(3), all set forth *infra*. One common thread between these disciplinary rules is that each applies only in the context of the professional relationship between lawyer and client. If the Bar does not show the existence of such a

relationship at the time of an alleged violation of one of these rules, an accused must be found not guilty.

The existence of a lawyer-client relationship between the accused and Mrs. Burgard is essential to all five causes of complaint. Thus, we examine whether the record reveals such a relationship during the times material to this proceeding.

The Trial Board found the accused to be acting as Mrs. Burgard's lawyer throughout the transactions at issue. The Trial Board reasoned that the accused had a continuing lawyer-client relationship with Mrs. Burgard because the accused had: (1) assisted in the land sale transaction in 1975; (2) prepared a will and trust agreement for Mrs. Burgard in 1976, both of which were the subject of continued consultations between Mrs. Burgard and the accused until 1981; (3) prepared a power of attorney in 1977, naming the accused as Mrs. Burgard's attorney in fact, under which the accused continued to act throughout their relationship by handling Mrs. Burgard's banking matters and the loans to third parties; (4) prepared conservatorship documents and had become conservator for Mr. Burgard in 1980 at the request of Mrs. Burgard; and (5) exercised his professional judgment in the loan transactions discussed above regarding the terms of the agreements and types of security to be taken. The Disciplinary Review Board found a lawyer-client relationship only in one loan transaction.

We agree with the Trial Board. We reach this conclusion from the continuing nature of the legal services provided by the accused to Mrs. Burgard and from his admission that he was providing legal services to Mrs. Burgard when he later exercised his power of attorney.

We consider the causes of complaint in chronological sequence.

A. *First Cause: The Accused's Loan From Mrs. Burgard.*

In January 1979, the accused was in need of about $5,000. He contemplated selling some Wells Fargo stock that he owned but would have had to sell at a loss at that time. The matter came up during one of his visits with Mrs. Burgard and she offered to loan the accused $5,000. The loan was made, and the accused signed a one-year promissory note in favor of

Mrs. Burgard, at 6 percent interest, secured by the accused's Wells Fargo stock. In lieu of paying interest, the accused agreed not to charge for his "ordinary non-legal services which consisted primarily of depositing her monthly checks." The accused also stated that he "was compensated for the time spent drafting these documents [the will and trust agreement] and his errand-boy services when the interest-free loan was made to him by Mrs. Burgard." Thus, his fee was considered as a credit against a part of the interest due on the loan from Mrs. Burgard.

The principal amount of the loan was repaid in full on March 18, 1981. The accused did not disclose to Mrs. Burgard any conflict of interest raised by this transaction or advise her to seek the advice of independent counsel. The accused testified before the Trial Board that he did not consider himself to be representing Mrs. Burgard as a lawyer at that time.

The Bar charged that the foregoing conduct in respect of the loan was a violation of DR 5-104(A).[1] DR 5-104(A) prohibits a lawyer from entering into a business transaction with a client when they have different interests "if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure." The Trial Board found the accused guilty of this charge. The Disciplinary Review Board found:

> "The weight of the evidence is that in January, 1979, Mrs. Burgard was not a client expecting the Accused as a lawyer to exercise his professional judgment for her protection. The Accused was a friend. The loan was not a substantial portion of her estate (in excess of $100,000). As of this time, the Accused had rendered many, many nonlawyer-like services for Mrs. Burgard and it is apparent that they had developed something of a personal relationship. She was handling her own financial affairs and appeared to know exactly what she

---

[1] "DR 5-104 Limiting Business Relations with a Client.

"(A) A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure."

was doing. It is doubtful if she relied on the Accused for anything except further friendly conversations and errands.

"Furthermore, client or not, there was a full disclosure and Mrs. Burgard was fully protected by the security of the Wells Fargo stock.

"We find the Accused not guilty of the first charge."

■ To prove a charge of violation of DR 5-104(A), the Bar must show: (1) that the person with whom a lawyer has entered a business transaction was a client of the lawyer at the time of the transaction, *see In re Geurts,* 280 Or 303, 570 P2d 652 (1977); (2) that the attorney and the client have different interests in a business transaction, *cf. In re Tonkon,* 292 Or 660, 666-67, 642 P2d 660 (1982); and (3) that the client expects the lawyer to exercise his professional judgment in the transaction for the protection of the client, *see In re Moore,* 299 Or 496, 506, 703 P2d 961 (1985). In *In re Montgomery,* 292 Or 796, 804, 643 P2d 338 (1982), we held that

"* * * when a lawyer seeks to borrow money from a non-lawyer client who is not in the business of lending money, the lawyer must assume, in the absence of contrary expression by the client, that the client is relying on the lawyer for professional judgment to the same extent that the client would rely on the lawyer for advice had the client consulted the lawyer concerning such a loan to a third person. * * *"

The same rule applies in this case. The accused was representing Mrs. Burgard at the time he obtained the loan.

■ Once the Bar has shown each of these elements, the accused can only escape liability by proving that the client had consented after full disclosure. Full disclosure under DR 5-104(A) includes the advice to obtain independent legal advice. *In re Bartlett,* 283 Or 487, 584 P2d 296 (1978). Here, the accused did not so advise Mrs. Burgard. Therefore, his disclosure was insufficient. The accused is guilty of violating DR 5-104(A).

B. *Fourth Cause: The Watkins Loan.*

In May 1979, the accused's secretary, Ms. Merry, and her fiance, Mr. Watkins, were in the process of purchasing a house. To close that transaction, they needed approximately $5,000. Watkins had another house that was in the process of being sold. However, because of delay, he needed a short-term

loan to conclude the purchase of the couple's new home. Ms. Merry was well-acquainted with Mrs. Burgard through their many telephone conversations. Ms. Merry asked the accused to approach Mrs. Burgard with her loan request, which he did. Mrs. Burgard knew and liked Ms. Merry and approved the loan. The loan was made on a demand note, at 12 percent interest, secured by an unrecorded mortgage on the house Watkins was selling. It was contemplated that the loan was to be repaid in 30 to 60 days. The loan was repaid in full, including interest, 97 days later. The Bar charged the accused with violations of DR 5-101(A) and 5-105(A), (B) and (C), for his participation in this transaction. DR 5-101(A) provides:

> "Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property or personal interests."

The Trial Board found the accused guilty of violating DR 5-101(A). The Disciplinary Review Board found that the accused was not representing either Mrs. Burgard or Ms. Merry and Mr. Watkins in that transaction and therefore DR 5-101(A) did not apply. The Disciplinary Review Board concluded:

> "The facts do not fit DR 5-101(A). * * * [T]he Accused had the consent of his client after full disclosure. His 'personal interests' were minimal and certainly not of such a nature to make the questioned transaction a violation of DR 5-101(A)."

This assessment does not take into account some pertinent facts.

■       Mrs. Burgard was the accused's client at the time of this loan. Mrs. Burgard knew the accused's relationship to Ms. Merry and that the loan was for Ms. Merry's benefit. The accused informed Mrs. Burgard that the loan was to be secured by a lien on Watkins' house. The accused obtained a mortgage on the property, but never recorded the document because it might have prevented or delayed the closing of the Watkins' house sale. The accused did not disclose to Mrs. Burgard that he did not record the mortgage, nor did he explain the risks inherent in an unrecorded mortgage. Further, the accused never advised Mrs. Burgard to consult independent counsel in this matter. We disagree with the

Disciplinary Review Board. Full disclosure was not made to Mrs. Burgard before she consented to the Watkins loan. The exercise of the accused's independent judgment reasonably may have been affected by his personal relationship with Ms. Merry, his secretary of approximately nine years. Therefore, the accused is guilty of violating DR 5-101(A) for his part in the Watkins loan.

■ DR 5-105(A) and (B)[2] require a lawyer to refuse to accept or continue employment if the interest of another client may impair the professional judgment of the lawyer. Although the accused was charged with violation of DR 5-105(C),[3] this provision merely provides a safe harbor for those who meet its terms for conduct which otherwise would be a violation of DR 5-105(A) or (B). DR 5-105(C) does not prohibit any conduct and cannot be "violated." *See, e.g., In re Vaile,* 300 Or 91, 97 n 4, 707 P2d 52 (1985).

■ There is no evidence that the accused represented Mr. Watkins or Ms. Merry in this or any related matter. DR 5-105 applies only in instances of dual representation. Therefore, DR 5-105 is not applicable to these facts. The accused is not guilty of violating DR 5-105(A) or (B).

C. *Second Cause: The Watson Loan.*

During her many social visits with the accused, Mrs. Burgard had expressed a desire to make loans to persons in

---

[2]

"DR 5-105 Refusing to Accept or Continue Employment if the Interest of Another Client May Impair the Independent Professional Judgment of the Lawyer.

"(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5-105(C).

"(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5-105(C)."

[3] DR 5-105(C) provides:

"In the situations covered by DR 5-105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each."

need. Her one desire was that she not lose any money in these transactions. In June 1980, the accused (using his power of attorney from Mrs. Burgard) arranged a loan of approximately $1,792 of Mrs. Burgard's funds to a Mr. and Mrs. Watson who needed the money to prevent foreclosure of a mortgage on their home. Mr. Watson was a mechanic and Mrs. Watson was a practical nurse. Their combined earnings were about $32,000 per year. The Watsons had been referred to the accused by a Mr. Finley, who operated a financial planning service. They came to the accused because they had been told that he might have access to some money to loan, not because they sought legal services in their behalf. Although the Watsons previously had been bankruptcy clients of the accused's law partner, the accused was not aware of this at the time he dealt with the Watsons.

The accused arranged the loan of Mrs. Burgard's funds to the Watsons and obtained a quitclaim deed to the Watsons' home as security. The accused told Mrs. Burgard that he was investing some of her money, but did not elaborate on the circumstances. Mrs. Burgard only cautioned the accused to make sure she did not lose anything. The accused characterized his participation in the Watson transaction as providing "legal services" to Mrs. Burgard. In his deposition taken by the Bar on April 8, 1983, the accused was asked:

"Q What was the next legal service that you rendered on her behalf after this trust agreement?"

He answered:

"A A loan to people named Watson. Now, I am interpreting legal service to mean the kind of thing for which an attorney charges a full fee and which is relatively formal in nature." Deposition at 13.

The Watsons made payments, but the accused personally paid off the remaining balance due to Mrs. Burgard when she terminated her relationship with the accused and revoked his power of attorney in 1981. The Watsons did not consider the accused to be acting as their lawyer in arranging this loan, nor did the accused undertake to act as their lawyer in this matter although he charged them approximately $200 for arranging the loan.

The accused was charged only with violations of DR 5-105(A), (B) and (C), for his participation in this transaction.

The Trial Board found that:

"On or about June 6, 1980, and without prior authorization from Mrs. Burgard, the Accused arranged a $2,000 loan between Edna Burgard and *the accused's law partner's clients,* Douglas and Marlene M. Watson. \* \* \*" (Emphasis added.)

However, the Bar's complaint alleged:

"VIII.

"In June, 1980, during the course of his representation of Mrs. Burgard, the Accused arranged a loan of $2,000 from Mrs. Burgard to *another couple the Accused was representing in order to avoid a foreclosure on the latter clients' house.* \* \* \*" (Emphasis added.)

■ We find that the accused was not representing the Watsons on the matter of the pending foreclosure. For two reasons, we decline to trace the previous representation of the Watsons by the partner of the accused to establish for disciplinary purposes the necessary standard or degree of culpability on the part of the accused. First, based upon the circumstances of this case, we do not conclude that the accused knew, or by the exercise of reasonable care should have known, facts establishing an actual or likely conflict of interest. *In re Johnson,* 300 Or 52, 61-62, 707 P2d 573 (1985). Secondly, the Bar charged the accused for presently representing the Watsons and not that a partner of the accused previously had represented the Watsons. The accused is entitled to fair notice of the factual predicate upon which the Bar intends to rely. *See In re Thomas,* 294 Or 505, 526, 659 P2d 960 (1983).

The Bar has failed to meet its burden on this cause. We find the accused not guilty of violating DR 5-105 as charged by the Bar.

D. *Third Cause: The Columbia Office Machines Loan.*

In October 1980, Mr. Rimer and Mr. Sakuma, clients of the accused, were operating a business corporation known as Columbia Office Machines and needed a business loan. Although the accused originally declined to give them any assistance, they persisted in their request and a $5,400 loan was made from Mrs. Burgard's funds on October 6, 1980. The

accused disclosed to Mrs. Burgard that he was going to invest the money and not put it back into a certificate of deposit, but he did not disclose to Mrs. Burgard the identity of the borrowers. The loan was evidenced only by an unsecured note executed by Mr. Rimer and Mr. Sakuma as individuals. A few days before the accused agreed to the loan, his eldest son had been severely injured in an automobile accident in Nevada, requiring the accused's presence. During this period, the accused was under considerable emotional stress, as his son had suffered spinal injuries and at times was not expected to survive.

Later, Columbia Office Machines and Mr. Rimer and Mr. Sakuma went bankrupt. The loan was repaid in full personally by the accused.

The Bar's complaint charges the accused with violations of DR 5-105(A), (B) and (C) for his conduct in this transaction. Both the Trial Board and the Disciplinary Review Board found the accused guilty of violations of DR 5-105(A) and (B). The Trial Board found that the accused represented Mrs. Burgard and Rimer and Sakuma at the time of the loan. The Disciplinary Review Board took a "roundabout" path to come to the same conclusion. The Disciplinary Review Board noted that the accused had been appointed as conservator for Mr. Burgard in 1980, the year that the loan to Columbia Office Machines was made. They reasoned that because the accused was serving as conservator, and as conservator would be responsible for at least one-half of Mr. and Mrs. Burgard's total joint assets, the accused could be considered as being the lawyer for both Mr. and Mrs. Burgard in this period of time. A conservator, the Disciplinary Review Board reasoned, would legally represent both Mr. and Mrs. Burgard as well as having a fiduciary duty to each of them. The Disciplinary Review Board found the accused to be representing Rimer and Sakuma as well as Mrs. Burgard (due to his position as her husband's conservator) without prior disclosure by the accused or informed consent given by any of the parties. The Disciplinary Review Board concluded that, therefore, the accused had violated DR 5-105(A) and (B).

The Trial Board found that the accused represented Mrs. Burgard at the time of the Columbia Office Machines loan for the same reasons that it had relied upon to find that relationship in the prior loan transactions.

For the reasons discussed above, we agree with the Trial Board. In this case, the accused accepted employment from Rimer and Sakuma in a matter (the $5,400 loan) where the exercise of his independent professional judgment in behalf of Mrs. Burgard was likely to be affected. He had instructions from Mrs. Burgard to ensure that she did not lose anything on loans of her funds which the accused was arranging. He was acting under the power of attorney as Mrs. Burgard's attorney in fact at the time he loaned the money to Rimer and Sakuma. The interests of Rimer and Sakuma were in conflict with those of Mrs. Burgard in the matter of determining the fiscal responsibility of Rimer and Sakuma, and obtaining adequate security for the loan. The accused violated DR 5-105(A) and (B) and is guilty of the third cause of complaint.

### E.  *Fifth Cause: The Accounting.*

The only remaining cause of complaint relating to the accused's relationship with Mrs. Burgard charges him with violating DR 9-102(B)(3) by failing to provide a specific and complete accounting of all the money that the accused had been managing for Mrs. Burgard and for failing to maintain complete records of all funds, securities and properties of Mrs. Burgard coming into his possession. DR 9-102(B)(3) provides:

"A lawyer shall:

"* * * * *

"(3)   Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them."

Both the Trial Board and the Disciplinary Review Board found the accused not guilty. Both noted that the Bar had failed to demonstrate that the funds came into the possession of the accused and that, because Mrs. Burgard maintained control over her own finances, it would be impossible to account in the usual sense. Both observed that the lawyer subsequently hired by Mrs. Burgard, who made the demand for an accounting, was satisfied with the materials and explanations given by the accused. We also find the accused not guilty of this charge.

## II. THE MARTINETTO PARTIAL DISTRIBUTION.

This sixth and last cause of complaint involves a probate matter unrelated to the accused's relationship to the Burgards. In this cause, the Bar charged that the accused, as personal representative of the Estate of Mary A. Martinetto, made a partial distribution of money to a distributee without first securing an order of the Probate Court as required by ORS 116.013. The complaint charges the accused with violations of DR 1-102(A)(5) and (6) and DR 7-102(A)(8) in that "the Accused engaged in conduct that was prejudicial to the administration of justice, conduct adversely reflecting on his fitness to practice law, and conduct he knew was illegal."

DR 1-102(A)(5) and (6) provide:

"A lawyer shall not:

"* * * * *

"(5) Engage in conduct that is prejudicial to the administration of justice.

"(6) Engage in any other conduct that adversely reflects on his fitness to practice law."

DR 7-102(A)(8) provides that:

"In his representation of a client, a lawyer shall not:

"* * * * *

"(8) Knowingly engage in other illegal conduct or conduct contrary to a Disciplinary Rule."

On or about September 11, 1980, the accused caused a partial distribution to be made of $3,000 from the estate. This partial distribution was made without seeking the prior court order contemplated by ORS 116.013.[4] The accused reported

---

[4] ORS 116.013 provides:

"Upon petition by the personal representative or other interested person, and after such notice and hearing as the court may prescribe, the court may order the personal representative to distribute, prior to final settlement and distribution, property of the estate to the person or persons who would be entitled to the property under the will or under intestate succession on final distribution, if the court finds that:

"(1) All inheritance taxes payable to the State of Oregon have been paid or the Department of Revenue has consented in writing to the distribution;

"(2) After the distribution sufficient assets will remain to pay support of spouse and children, expenses of administration, unpaid claims and all known unpaid creditors of the decedent or of the estate; and

"(3) The distribution may be made without loss to creditors or injury to the estate or to any interested person."

the partial distribution in his final account and the account was approved. The distributee was entitled to receive the distribution.

■      Both the Trial Board and the Disciplinary Review Board found the accused not guilty of the charges related to the partial distribution in the estate. Both found that the accused did not knowingly violate ORS 116.013. More to the point, we conclude that the Bar did not prove that the accused engaged in "conduct he knew was illegal" as alleged in the complaint. Furthermore, both found that the Bar failed to carry its burden of proof to show that the accused's conduct prejudiced the administration of justice or that such conduct adversely reflected on his fitness to practice law. We agree.

## III.   SANCTION.

■      We have found the accused guilty of violating DR 5-101(A), 5-104(A), and 5-105(A) and (B). Therefore, we are called upon to determine the appropriate sanction. The Trial Board, based upon its findings of guilt, recommended a 90-day suspension. The Disciplinary Review Board, based upon its lesser findings of guilt, recommended a reprimand.

*In re Boivin*, 271 Or 419, 533 P2d 171 (1975), involved violations of DR 5-104(A) and 5-105(A) and (B) by a lawyer who represented both the buyer and seller in a business transaction involving transfer of a lease to property owned by the lawyer. We found the lawyer to have a direct personal interest in the transaction and that he did not make full disclosure to his client. We held:

> "There was no evidence in this case that * * * [the buyer] suffered any loss or damage as a result of anything that the accused did or failed to do. We have disciplined lawyers who have borrowed money from clients without insisting that they obtain independent legal advice by suspensions from practice even though the client eventually suffered no loss. There was no evidence in this case, however, to impugn the complete good faith and honesty of the accused and his previous record is unblemished as a lawyer and as a good citizen.

> "For this reason, and under all of the circumstances of this case, we believe that this reprimand of the accused for his misconduct is sufficient." 271 Or at 428. (Citations omitted.)

The present case involves more than a single violation. Each of the violations is a serious matter. However, we find that the accused acted in the utmost good faith throughout his relationship with the Burgards. We do not doubt the accused's motivation arose from kindness and consideration for those less fortunate. The Burgards did not lose anything as a result of the accused's conduct. On the contrary, they were provided with many valuable services for which they were never charged. We find that the accused acted throughout without guile or improper motive. This, however, does not alter the fact that the accused did violate the Code of Professional Responsibility. Under the circumstances of this case, we hold that a reprimand, in the form of this opinion, will serve as a sufficient sanction.

The Oregon State Bar is awarded its actual and necessary costs and disbursements. ORS 9.536(4).