Argued and submitted March 9, accused suspended from the practice of law for 90 days, commencing 60 days from the filing of this decision May 20, 2004

In re Complaint as to the Conduct of

ALLAN F. KNAPPENBERGER,
*Accused.*

(OSB 01-9, 01-121, 01-122; SC S49996)

90 P3d 614

Peter R. Jarvis, Hinshaw & Culbertson, Portland, argued the cause and filed the briefs for the accused. With him on the briefs was Leta E. Gorman.

Stacy J. Hankin, Assistant Disciplinary Counsel, Lake Oswego, argued the cause and filed the brief for the Oregon State Bar.

PER CURIAM

## PER CURIAM

In this lawyer disciplinary proceeding, the Oregon State Bar (Bar) charged Allan F. Knappenberger (the accused) with violating Code of Professional Responsibility Disciplinary Rule (DR) 5-101(A) (conflict of interest with lawyer's self-interest) and DR 6-101(B) (neglect of legal matter) in the course of representing three clients: Mura, Loitz, and Bridge. A trial panel of the Disciplinary Board concluded that the accused committed the alleged violations and imposed a one-year suspension (with nine months stayed pending satisfactory compliance with conditions described below) and a two-year probationary period.

On automatic and *de novo* review, ORS 9.536(2)-(3) (2001), we conclude that the accused violated DR 5-101(A) and DR 6-101(B) respectively in the Mura and Loitz matters, but that the accused did not violate DR 5-101(A) and DR 6-101(B) in the Bridge matter. We suspend the accused from the practice of law for 90 days.

## I.  FACTS

The Bar has established the following facts by clear and convincing evidence. BR 5.2. The accused is a sole practitioner admitted to the Bar in 1973. He works principally as a domestic relations lawyer, although he also has experience in criminal law and other matters.

A.  *The Mura Matter*

In June 1993, Mura pleaded guilty to a charge of sexual abuse of his daughter. Later that year, Mura's daughter allegedly recanted her allegation of abuse. Mura then retained the accused to represent him in post-conviction proceedings. In October 1993, the accused filed a petition for post-conviction relief based in part on the alleged recantation and the failure of Mura's original lawyer to investigate the possibility that another person had abused Mura's child.

Due to a calendaring error, the accused filed the petition one day late.[1] In January 1994, the state filed a

---

[1] ORS 138.510(2) (1991) established a 120-day filing period for petitions for post-conviction relief. Oregon Laws 1993, chapter 517, section 1, extended to two years the time to file a petition for post-conviction relief. ORS 138.510(2) (1993).

motion to dismiss the petition on the ground that it had not been filed timely.

On January 30, 1994, the accused sent Mura two letters. The first letter included a copy of the state's motion to dismiss, informed Mura that he need not be present at the February 14, 1994, hearing on the state's motion, and stated that Mura and the accused would have to discuss the accused's further participation in the case in light of Mura's financial situation. The second letter informed Mura of the February 28, 1994, trial date and again emphasized that they would have to discuss attorney fees before the accused would proceed further with his representation of Mura. Neither letter discussed with Mura the potential import of the state's motion to dismiss. In addition, although the accused arguably had committed malpractice by failing to meet the post-conviction filing deadline, neither letter suggested in any way that a potential conflict of interest could arise out of the accused's error or suggested that Mura consider seeking independent legal advice.

The accused met with Mura on February 1, 1994. According to a February 2, 1994, memorandum that the accused dictated, the accused informed Mura at the meeting that his case "had slipped substantially as a result of not getting the little girl to the psychologist back in October or November, 1993." The accused further informed Mura that he would not continue to work on the case without getting paid and that he would not blame Mura "for dismissing the case at this time and cutting his losses." The memorandum does not state that the accused discussed the motion to dismiss with Mura other than to remind Mura that the hearing was imminent.

The accused responded to the state's motion to dismiss on February 13, 1994. The accused's memorandum in opposition and accompanying affidavit argued that the trial court should deny the motion because the accused had caused the untimely filing and the accused's delay was not attributable to Mura. Although the accused testified at the trial panel hearing that he sent a copy of his response to Mura, Mura did not testify that he received that response, and the accused's

time sheet entries do not indicate that the accused sent a copy of the response to Mura.

At the February 14, 1994, hearing, the trial court granted the state's motion to dismiss, concluding that the petition had not been filed timely and had not alleged facts that constituted grounds for the late filing. On February 21, 1994, the accused informed Mura by letter that the court had dismissed his petition due to a missed deadline and that Mura had 30 days in which to file a notice of appeal.

## B. *The Loitz Matter*

Loitz retained the accused in 1997 with the goal of reducing monthly spousal support payments. Following a trial, the trial court ordered a reduction in Loitz's monthly support obligation, but the reduction was not as much as the accused hoped. The accused encouraged Loitz to appeal. Loitz took the accused's advice, and the accused filed, briefed, and argued the case before the Court of Appeals.

The accused spoke with Loitz on the same day as the Court of Appeals oral argument, September 21, 1999. Except for one telephone call on January 27, 2000, the accused had no further communication with Loitz regarding his case. During the subsequent months, however, the following events occurred. On September 28, 1999, the accused received a letter from Court Bonds, the company that had issued the *supersedeas* bond for Loitz's appeal, reminding the accused that the premium on the *supersedeas* bond was overdue. On October 6, the Court of Appeals affirmed without opinion the trial judge's decision. On October 12, opposing counsel filed a statement for costs and a petition for attorney fees, and mailed a copy to the accused, which the accused received on October 15. On October 18, the accused received a second letter from Court Bonds reminding him that the premium on the *supersedeas* bond was overdue. On October 21, the accused received a copy of a letter from opposing counsel to the Court of Appeals related to the petition for attorney fees. On November 18, Court Bonds sent a third letter to the accused demanding premium payment on the *supersedeas* bond within 10 working days. On November 19, the accused dictated a letter to Loitz regarding the need to renew the

bond, but the dictation tape was not transcribed and no letter was sent to Loitz.

Loitz learned of the overdue payment on the bond when he received a November 30, 1999, letter from Court Bonds. In early December 1999, Loitz faxed the accused twice and called the accused's office questioning whether the issue of the bond had been addressed and whether the Court of Appeals had rendered a decision. The accused did not respond to those inquiries. On December 20, the Court of Appeals issued an appellate judgment against Loitz in the amount of $8,157.50.

During those months, the accused's staff gave him a daily log outlining the first-class mail that the accused received. The accused was responsible for reviewing the log and the mail, and either handling the mail himself or delegating that task to his staff. Although the accused received the above-described correspondence and although the Court of Appeals decision was in the accused's client file, the accused did not send those documents to Loitz or otherwise notify Loitz of their contents.

Loitz spoke with the accused on January 27, 2000, but, in Loitz's words, received "no news" on the Court of Appeals decision. Loitz first learned of the Court of Appeals decision and the appellate judgment against him when he sold a piece of property in July 2000 and the title search identified the judgment. Loitz again attempted to contact the accused, but the accused did not respond.

C.   *The Bridge Matter*

Bridge retained the accused to represent her in a marital dissolution proceeding in which the main issue was the validity of a prenuptial agreement. In July 1998, the trial court signed a judgment of dissolution of marriage upholding the validity of the agreement, but nonetheless awarded some spousal support to Bridge. The accused filed a notice of appeal in August 1998. The opposing party cross-appealed.

In June 1999, counsel for the opposing party filed an answering brief. That brief included a motion to dismiss Bridge's appeal on the ground that the accused had failed to serve properly Bridge's former husband with the notice of

appeal.[2] The accused thought that the motion had little chance of success. The accused sent the opposing party's brief to Bridge with a transmittal letter that did not call express attention to the risk of dismissal as a result of the motion.

The accused discussed the status of the case with Bridge on May 6, 1999, August 11, 1999, and January 5, 2000. There is no indication in the record whether the accused discussed the motion with Bridge or whether she questioned the accused about the motion.

On April 12, 2000, the Court of Appeals dismissed Bridge's appeal, because the accused had failed to serve the notice of appeal properly. *Bridge*, 166 Or App at 462. Due to the cross-appeal, however, the Court of Appeals addressed the validity of the prenuptial agreement, rejected the accused's arguments, and vacated the spousal support award to the accused's client. *Id.* at 463-65.

Bridge first received notice of the Court of Appeals decision from a friend on April 27, 2000. In her testimony before the trial panel, Bridge asserted that she must have attempted to contact the accused after hearing about the decision. There is no contemporaneous record of such an attempt, however, and Bridge testified that she was not sure if she had contacted or had attempted to contact the accused. For his part, the accused asserted at the trial panel hearing that he had sent a copy of the Court of Appeals decision to Bridge or that he had contacted her in April 2000 regarding that decision, though there is no record of such an attempt.

At his own expense, the accused hired another lawyer to file a petition for review in this court and, on May 17, 2000, requested an extension of time in which to file that petition. He sent Bridge a copy of that motion and later sent Bridge a copy of the petition for review. The accused spoke

---

[2] The trial court's judgment had discharged opposing counsel, and the opposing party (husband) was unrepresented at the time that the accused filed the notice of appeal. Opposing counsel successfully argued that the notice of appeal was defective because the accused could not show that he had served the notice on the unrepresented husband. *Bridge and Bridge*, 166 Or App 458, 461-62, 998 P2d 780 (2000) (discussing motion to dismiss appeal). *But see Ginther and Ginther*, 167 Or App 418, 423-24 & n 4, 1 P3d 1062 (2000) (discussing ORS 9.390 and its requirement that adverse party receive notice of withdrawal of counsel, and distinguishing *Bridge*).

with Bridge about the Court of Appeals decision on May 22, 2000. At that time, the accused discussed his "plans to appeal the appeal."

It is unclear whether Bridge spoke to the accused after May 22, 2000. Although Bridge apparently kept a daily logbook of her activities, including telephone calls, she also stated at the trial panel hearing that she had "tried to" record instances when the accused contacted her.

The accused did not inform Bridge that opposing counsel filed a petition for costs and attorney fees, that this court denied Bridge's petition for review, and that the Court of Appeals entered an appellate judgment against her in the amount of $3,320.50. Bridge first learned about those events when a collection agency contacted her in November 2000. Bridge sent a letter to the accused in December 2000 that generally complained about the quality of the accused's representation. The accused did not respond to that letter.

## II.  PROCEDURAL HISTORY

In an amended formal complaint filed in August 2001, the Bar alleged one violation of DR 5-101(A) arising out of the accused's conduct in the Mura matter, one violation of DR 6-101(B) arising out of the accused's conduct in the Loitz matter, and violations of DR 5-101(A) and DR 6-101(B) respectively arising out of the accused's conduct in the Bridge matter. The trial panel held a hearing at which Mura, Loitz, Bridge, and the accused testified.

The trial panel found that the accused committed the four alleged violations. The trial panel suspended the accused for one year, with nine months stayed pending satisfactory compliance with certain requirements. The trial panel required the accused (1) to seek counsel and guidance regarding office management procedures; and (2) to submit to psychological screening for the purpose of determining whether his work habits are the result of treatable conditions. The trial panel also imposed a two-year probationary period to follow the accused's three-month active suspension.

## III. DISCUSSION

The accused concedes that he violated DR 5-101(A) in the Mura matter, a concession with which we agree, but he disputes the trial panel's sanction for that violation. We therefore address the conceded violation of DR 5-101(A) in the sanctions analysis below. We turn to the merits of the Bar's charges that the accused violated DR 6-101(B) in the Loitz matter and violated DR 6-101(B) and DR 5-101(A) in the Bridge matter.

### A. *DR 6-101(B)*

■ ■ DR 6-101(B) provides that "[a] lawyer shall not neglect a legal matter entrusted to the lawyer." Determining whether a lawyer violated DR 6-101(B) is a fact-specific inquiry in which, using an objective standard, we assess whether the lawyer acted neglectfully. *See In re Magar*, 335 Or 306, 319, 66 P3d 1014 (2003) (stating that lawyer's mental state is irrelevant when determining whether lawyer acted neglectfully). The neglect inquiry is not dependent on the outcome of the matter at issue. Rather, viewing the lawyer's conduct along a temporal continuum, we consider whether the lawyer engaged in a course of neglectful conduct that reflects a "failure to act or * * * failure to act diligently." *Id.* at 321.

■ In the present case, the accused argues that the Bar has not shown a course of neglectful conduct in the Loitz matter and, in particular, emphasizes that he diligently tried and appealed Loitz's case. Although he concedes that information "fell through the cracks" after September 1999, the accused attributes those circumstances to unreliable office procedures and misfiling.

The Bar counters that, after September 21, 1999, the accused failed to perform any significant work in the Loitz matter. The Bar argues that the accused failed to review the mail and mail logs that his staff prepared; failed to respond to important events in Loitz's case, including the Court of Appeals decision, the petition for attorney fees, the money judgment, and the letters from Court Bonds; failed to inform Loitz of those events; and failed to respond to Loitz's inquiries regarding the bond and the Court of Appeals decision.

We conclude that the accused violated DR 6-101(B) with respect to the Loitz matter. Over the course of several months in late 1999 and early 2000, several significant events occurred in Loitz's case. Although the accused admittedly received correspondence on several occasions from multiple sources regarding those events and although Loitz sought information from the accused in early December 1999, the accused's only response was a single dictated, but untranscribed, letter and one telephone call in which he failed to apprise Loitz of the Court of Appeals decision or the judgment against him. Evidently, the accused not only failed to read and respond to mail related to the Loitz matter when his office received it, but he neglected otherwise to check on the status of Loitz's case anytime thereafter, despite Loitz's inquiries. Those failures demonstrate a violation of DR 6-101(B).

The accused's emphasis on his pre-September 1999 representation of Loitz does not absolve him of responsibility for his later neglect. Assuming without deciding that the accused diligently tried and appealed Loitz's case through oral argument in the Court of Appeals, that diligence did not give the accused license to abandon his client after oral argument in light of the later events that called for his attention. We agree with the trial panel that the accused's handling of the Loitz matter shows a course of neglectful conduct sufficient to sustain the Bar's burden on the second cause of complaint.

■       We reach a different conclusion with respect to the Bridge matter. The accused emphasizes that he sent Bridge copies of the relevant documents, initiated contact with Bridge to discuss the status of her case and the Court of Appeals decision, and pursued a petition for review in Bridge's case at his own expense. The accused also notes that Bridge testified before the trial panel that she was able to speak with the accused or his legal assistant when she wished to do so.

The Bar asserts that the accused first violated DR 6-101(B) by failing to serve the notice of appeal properly. The Bar also argues that the accused failed to communicate adequately with Bridge and to inform Bridge of the statement for

attorney fees, this court's denial of review, and the entry of a money judgment against Bridge.

In contrast to the Loitz matter, the accused did not engage in a course of neglectful conduct while representing Bridge. As an initial matter, the Bar overreaches when it asserts that the accused violated DR 6-101(B) by failing to serve the notice of appeal properly. As this court made clear in *Magar*, 335 Or at 320-21, a single instance of arguably neglectful conduct does not suffice to establish a violation of DR 6-101(B). Furthermore, unlike the Loitz matter, the accused read and responded to the mail that he received regarding Bridge's case, and he sent Bridge copies of that correspondence. The accused updated Bridge on the status of the case while it was under consideration by the Court of Appeals, and, following the court's decision, he pursued a petition in this court. He informed Bridge of that action and sent her copies of the relevant documents.

The Bar faults the accused for failing to keep Bridge informed of the risk of dismissal inherent in the state's motion to dismiss and the status of her case in the Court of Appeals. In fact, however, the record contains conflicting and incomplete testimony on that score. As noted above, the accused may have discussed the motion with Bridge, and the accused testified that it was likely that he did contact Bridge regarding the Court of Appeals decision. Bridge was unable to testify with certainty when and whether she spoke to the accused, at one point stating, "It's a long time ago and my memory is not that great." Her uncertain testimony also called into question the accuracy and completeness of her daily logbook.

In those ways, this cause of complaint is unlike the accused's handling of the Loitz matter as well as earlier cases finding neglect of a legal matter. *See In re McKee*, 316 Or 114, 127, 849 P2d 509 (1993) (finding accused lawyer to have neglected matter when he failed to contact witnesses, allowed matter to be dismissed due to clerical error, and failed to keep client informed of progress of case); *In re Recker*, 309 Or 633, 636, 789 P2d 663 (1990) (accused lawyer neglected matter when she accepted client's case, but failed to return calls, failed to perform any work on matter, and

failed to return original documents or cash advance). Although the question is a close one in light of the accused's failures to inform Bridge of this court's denial of review and the judgment against her, the Bar has not shown by clear and convincing evidence a course of neglectful conduct with respect to the accused's handling of the Bridge matter.

## B. *DR 5-101(A)*

The trial panel also found that the accused violated DR 5-101(A) in the Bridge matter. DR 5-101(A) provides, in part:

> "Except with the consent of the lawyer's client after full disclosure,
>
> "(1) a lawyer shall not accept or continue employment if the exercise of the lawyer's professional judgment on behalf of the lawyer's client will be or reasonably may be affected by the lawyer's own financial, business, property, or personal interests. * * *"

DR 10-101(B)(1) defines "full disclosure" as "an explanation sufficient to apprise the recipient of the potential adverse impact on the recipient, of the matter to which the recipient is asked to consent." DR 10-101(B)(2) further provides that, as used in DR 5-101, " 'full disclosure' shall also include a recommendation that the recipient seek independent legal advice to determine if consent should be given and shall be contemporaneously confirmed in writing."

The parties focus on whether the accused's interests in minimizing his service-of-process error and avoiding a potential malpractice claim would have affected or reasonably may have affected the exercise of his professional judgment on behalf of Bridge. The accused disputes the Bar's assertion that the error triggered a conflict requiring consent after full disclosure under DR 5-101(A). First, the accused argues that no clear and convincing evidence demonstrates that his service-of-process error would have resulted in malpractice liability given his reasonable belief in the likelihood that the motion to dismiss would fail. He also notes that the error was legally harmless because the Court of Appeals addressed his substantive arguments in reaching the merits of the cross-appeal. Finally, the accused emphasizes that,

even after he recognized the significance of his error, he was in no position to exercise his professional judgment in any way other than to attempt to correct the error, in which case his interests were aligned with the interests of his client.

The Bar responds that "the pendency or potential pendency of a malpractice claim by a client against a lawyer triggers the lawyer's duty to obtain consent after full disclosure as provided in DR 5-101(A)(1)." In this instance, the Bar asserts that a potential malpractice claim against the accused arose when the opposing lawyer moved to dismiss the appeal or when the Court of Appeals granted that motion. That potential claim, according to the Bar, reasonably may have impaired the accused's exercise of his professional judgment while representing Bridge, thus requiring him to seek Bridge's consent pursuant to DR 5-101(A).

As with the other conflict-of-interest rules, DR 5-101(A) is "based upon the concern that, when a lawyer undertakes the representation of a client with interests differing from the interests of the lawyer or the lawyer's other clients, the lawyer's judgment might become impaired or the lawyer's loyalty might become divided." *In re Kluge*, 335 Or 326, 335, 66 P3d 492 (2003). To vindicate that concern and to prevent compromised representation, DR 5-101(A) requires a lawyer to look forward and to determine whether, in accepting or continuing representation, the lawyer's and the client's interests will conflict—in terms of DR 5-101(A)(1), whether the lawyer's professional judgment "will be or reasonably may be affected" by his or her own interests. That operative text expresses two degrees of certainty with respect to that determination. *Cf. In re Tonkon*, 292 Or 660, 666, 642 P2d 660 (1982) (interpreting *former* DR 5-101(A) (1980)). That is, DR 5-101(A) requires consent after full disclosure if, based on the facts in an individual case, (1) the exercise of the lawyer's professional judgment "will be" affected by his or her financial, business, property, or personal interests, regardless of whether the determination of an effect on the lawyer's professional judgment is reasonable; or (2) the exercise of the lawyer's professional judgment "reasonably may be affected" by his or her financial, business, property, or personal interests. By using "may" rather than "will," the latter phrase expresses a lesser degree of certainty and sweeps more

broadly than the former. This court recently emphasized, however, that under DR 5-101(A) the determination whether a lawyer's professional judgment "may be affected" must be reasonable. *In re Obert*, 336 Or 640, 648, 89 P3d 1173 (2004).

In certain circumstances, the desire to avoid or to minimize potential liability for an error made during the course of a lawyer's representation of a client may require consent after full disclosure under either of the two scenarios described in the wording of DR 5-101(A). By linking any *potential* malpractice claim with a duty to disclose and seek consent under DR 5-101(A), however, the Bar seems to be suggesting the adoption of a *per se* rule.[3] In effect, the Bar presumes that, in all factual circumstances, any error by a lawyer that may harm his or her client, and thus every potential malpractice claim, will or reasonably may affect the lawyer's professional judgment in a way that implicates DR 5-101(A).

The Bar's interpretation is incorrect. Many errors by a lawyer may involve a low risk of harm to the client or low risk of ultimate liability for the lawyer, thereby vitiating the danger that the lawyer's own interests will endanger his or her exercise of professional judgment on behalf of the client. Even if the risk of some harm to the client is high, the actual effect of that harm may be minimal, or, if an error does occur, it may be remedied with little or no harm to the client. In those circumstances, it is possible for a lawyer to continue to exercise his or her professional judgment on behalf of the client without placing the quality of representation at risk. *See In re Hopp*, 291 Or 697, 634 P2d 238 (1981) (finding no DR 5-101(A) violation when accused had incidental financial or proprietary interest in outcome of litigation). It simply does not follow, then, that any error made during the course of a lawyer's representation will or *reasonably* may affect his or her professional judgment in a way that requires consent after disclosure under DR 5-101(A).[4]

---

[3] Indeed, as quoted above, 336 Or at 27, the Bar's stated position sweeps broadly. Some potential for a malpractice claim exists in every case, and a lawyer's concern about malpractice liability need not await any actual or alleged error. What the Bar does not recognize is that, by its terms and taken to its logical conclusion, the Bar's approach would require a lawyer to disclose that conflict and seek consent from the client at the outset of virtually every case.

[4] The Bar mistakenly relies on *In re Lawrence*, 332 Or 502, 31 P3d 1078 (2001), to support its interpretation of DR 5-101(A). In *Lawrence*, the trial court entered a

■    We do not catalogue the myriad situations in which a lawyer's error does or does not trigger DR 5-101(A). It suffices to say that, to prove a violation of DR 5-101(A), the Bar cannot assert simply that an error occurred and, therefore, created some risk, however minimal, of impaired professional judgment as a result of the potential malpractice liability. Rather, the Bar must show by clear and convincing evidence that the lawyer's error, and the pending or potential liability arising from that error, will or reasonably may affect the lawyer's professional judgment. That conclusion will depend on the facts and circumstances of each case.

In the present matter, the Bar has failed to meet its burden. Before the opposing party filed the motion to dismiss the appeal, the accused did not recognize that he made an error in serving the notice of appeal. After reading the motion, the accused realized that, if granted, the motion imperiled his client's case, and he called Bridge's attention to the motion. In the accused's opinion, however, the motion had little chance for success. And, although the Bar alleges that the motion immediately raised the potential for malpractice liability, the Bar does not assert that the accused's opinion was unreasonable or that it would have been evident to a reasonable lawyer at that time that Bridge had a viable malpractice claim. Thus, the unlikelihood of the motion's success reduced the risk to the client from the alleged error, and, even in light of that risk, the accused was not in a position to

default judgment against the accused lawyer's client after the lawyer failed to file a timely response. After being advised that the client had a viable legal malpractice claim against him, the lawyer continued to represent the client in other matters without making a full written disclosure, and, more importantly, he obtained a written release from his client, which provided that the lawyer would continue to handle other matters for the client for no fee in exchange for his client giving up any malpractice claim against the lawyer.

*Lawrence* did not state a general principle that any claim or potential claim for malpractice triggers DR 5-101(A). This court did not examine when DR 5-101(A) became operative in such circumstances, and this court's discussion focused solely on whether the accused lawyer satisfied the definition of "full disclosure" in DR 10-101 despite his failure to confirm his oral advice in writing. Moreover, *Lawrence* did not involve merely a harmful error on the part of the lawyer. After the error had occurred, the lawyer clearly responded to the possibility of a malpractice claim by essentially settling the potential claim for an amount that would be determined by the extent of his further work for the client.

expect that his alleged error would result in malpractice liability. *See Stevens v. Bispham*, 316 Or 221, 227, 851 P2d 556 (1993) (describing elements of legal malpractice claim). When opposing counsel filed the motion, then, there is no clear and convincing evidence that the accused's professional judgment was affected, nor is it reasonable to conclude that the error may have affected the accused's professional judgment.

Once the Court of Appeals granted the motion, the accused obviously realized that he made an error, but he also understood that the error would not have altered the ultimate outcome of Bridge's case. As noted, because of the cross-appeal, the Court of Appeals still reached the merits and rejected the accused's arguments. The court's decision revealed that the accused's error did not eliminate the possibility of an otherwise successful appeal. In the absence of such a causal link, the risk of malpractice liability arising from the accused's error remained remote to nonexistent. The facts demonstrate that no violation of DR 5-101(A) occurred in the Bridge matter.

## IV. SANCTION

■      The parties agree, as do we, that probation and the conditions that the trial panel imposed are inappropriate. We turn to whether a suspension is appropriate for the accused's violations of DR 5-101(A) in the Mura matter and DR 6-101(B) in the Loitz matter, and, if so, what length of suspension to impose.

■      To determine the appropriate sanction, we rely on the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (ABA Standards). *Kluge*, 335 Or at 348. We make a preliminary determination of the appropriate sanction by considering (1) the duty violated, (2) the accused's mental state, and (3) the actual or potential injury caused by the accused's misconduct. ABA Standard 3.0. We then examine any aggravating or mitigating circumstances to determine if the sanction should be adjusted. Finally, we review our prior case law for guidance in determining the appropriate sanction. *In re Worth*, 336 Or 256, 274, 82 P3d 605 (2003).

## A. *Preliminary Analysis*

With regard to the duty violated, the accused violated duties that he owed to his clients in both matters. With regard to the mental state, the accused acted with knowledge of the conflict of interest in the Mura matter. The accused was aware of the jeopardy to Mura resulting from his error, which gave rise to the acknowledged conflict. ABA Standards at 7 (defining "knowledge" as "the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result"). In neglecting the Loitz matter, the accused acted negligently. *Id.* (defining "negligence" as "the failure of a lawyer to heed a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation"). Finally, with regard to actual or potential injury, Mura suffered potential harm as a result of the accused's divided loyalty, and Loitz suffered anxiety and frustration, as well as the potential injury to his legal interests, as a result of the accused's neglect.

We find preliminarily that a suspension is the appropriate sanction for both violations. ABA Standard 4.32 provides that "[s]uspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client." ABA Standard 4.42 provides that "[s]uspension is generally appropriate when * * * (b) a lawyer engages in a pattern of neglect and causes injury or potential injury to a client." In this instance, the accused acted with knowledge of the conflict in the Mura matter and did not fully disclose that conflict to Mura, and the accused engaged in a pattern of neglect in the Loitz matter.

## B. *Aggravating and Mitigating Circumstances*

We next consider the applicable aggravating and mitigating factors to determine whether we should adjust the preliminary sanction. First, the accused has had two prior disciplinary offenses. The Bar admonished the accused for violating DR 5-101(A) in 1990. Because that admonition involved the same disciplinary rule at issue in the Mura matter and a similar conflict between a client and the accused's

personal interests, we consider it as evidence of past misconduct. *In re Cohen*, 330 Or 489, 498-501, 8 P3d 953 (2000) (explaining treatment of letters of admonition in sanctions analysis); *In re Jones*, 326 Or 195, 200, 951 P2d 149 (1997) (discussing considerations in application of "prior offenses" aggravating factor). The Bar reprimanded the accused for violating DR 7-104(A)(1) (communicating with represented party on subject of representation) in 2000, and we accord that reprimand some, but not considerable, weight. As to the other aggravating factors, the accused engaged in multiple offenses and has substantial experience in the practice of law. The sole mitigating circumstance is that the accused had a cooperative attitude toward the disciplinary proceedings.

C. *Case Law*

Citing *In re Howser*, 329 Or 404, 987 P2d 496 (1999); *In re Cohen*, 316 Or 657, 853 P2d 286 (1993); and *In re Harrington*, 301 Or 18, 718 P2d 725 (1986), the accused argues that a reprimand is the appropriate sanction for the conceded violation of DR 5-101(A) in the Mura matter. We agree with the Bar, however, that the cases that the accused cites are inapposite. In *Howser*, which involved violations of DR 5-105(C) and DR 2-110(B), this court imposed a reprimand in light of the accused lawyer's lack of a prior disciplinary record and after concluding that the mitigating factors outweighed the aggravating factors. In *Cohen*, this court imposed a reprimand for a violation of DR 5-105(E) after concluding that the mitigating factors outweighed the aggravating factors and that the accused lawyer's clients were not actually injured. Finally, in *Harrington*, this court noted that the accused lawyer acted in the utmost good faith, was motivated by kindness and consideration for the less fortunate, and did not cause injury to his clients.

Here, the accused cannot point to similar factors that led this court to favor a reprimand in *Howser*, *Cohen*, and *Harrington*, and, in addition, the aggravating factors outweigh the mitigating factors. More on point is *In re Hockett*, 303 Or 150, 734 P2d 877 (1987), in which this court explained that a single violation of a conflicts rule would justify a 30-day suspension. *Id.* at 163-64.

In cases involving DR 6-101(B) violations similar to the accused's violation, this court generally has imposed

60-day suspensions. *See In re LaBahn*, 335 Or 357, 67 P3d 381 (2003) (60-day suspension for single violation of DR 6-101(B)); *In re Schaffner*, 323 Or 472, 918 P2d 813 (1996) (60-day suspension for knowing neglect of clients' case over period of time); *cf. Cohen*, 330 Or at 506-07 (reprimand for single violation of DR 6-101(B) when multiple mitigating factors existed). Here, the accused's misconduct in the Loitz matter did not result in as serious an injury to his client as the misconduct at issue in *LaBahn* and did not involve a knowing violation, as in *Schaffner*. Nevertheless, the accused's neglect of Loitz's case over several months caused Loitz anxiety and frustration, and deprived Loitz of an opportunity to be made aware of the appellate judgment against him and respond accordingly. We also note again that the aggravating factors outweigh the mitigating factors.

In accordance with the above analysis, we conclude that a 90-day suspension is appropriate for the accused's violations of DR 5-101(A) and DR 6-101(B).

The accused is suspended from the practice of law for 90 days, commencing 60 days from the date of filing of this decision.